## Carson *vs.* Murray and others.

Where a husband and wife agreed to separate, and articles of separation were executed by them, and also by a trustee; which articles contained a provision for the payment of an annuity of $125 per annum to the wife during her life, as alimony; in consideration of which she agreed to release her right to dower in the estate of her husband ; and afterwards the husband made his will, and therein directed his executors to sell his real estate, and to invest one third part of the net proceeds of the sale at interest, and to pay such interest to his wife during her life, which provision he declared should be in full recompense for, and a bar of her dower in such real estate ; *Held,* that the wife was entitled to the provision secured to her in the articles of separation, and also to the provision made in her favor in the will of her husband.

A valid agreement may be made between husband and wife, through the medium of a trustee, for an immediate separation, and for a separate allowance to the wife for her support.

But an agreement for a separation cannot be supported, unless the separation has already taken place, or is to take place immediately upon the execution of such agreement.

An agreement for a separation will be rescinded, if the parties afterwards cohabit, or live together as husband and wife by mutual consent, for ever so short a time.

A stipulation in the articles of separation reserving to the parties the right of visiting each other, in case of sickness, by mutual consent, if not afterwards carried into effect will not render the agreement void.

*A wife cannot relinquish her dower in the real estate of her husband by exe-*
*cuting a release thereof to him, or in any other way than by joining with*
*him in a conveyance to a third person.*

THIS was an appeal from a decree of the vice chancellor of
the third circuit, by the defendants, Murray and Woolley, the
two executors of J. Carson, deceased, who had made probate
of the will. The complainant stated, in her bill, that she was
married to J. Carson in 1801, and continued to live with him
until September, 1826, when, owing to some unhappy dis-
putes between her and her husband, they agreed to separate ;
and that articles of agreement were mutually executed by and
between them and by the defendant Bailey, acting as trustee
between the complainant and her husband. That the articles
of separation contained a provison for alimony in favor of the
complainant, in consideration of her relinquishing, and fully
and absolutely releasing all claims, in the nature of dower or
otherwise, against the estate of her husband ; and by which
articles she was to be paid, as and for such alimony, $125 per
annum, in quarterly payments, during her life. That in con-
sideration of that provision she consented to release, and did
release her dower. That the annual allowance was paid to
her for the space of two years, when the payment thereof
was discontinued, leaving her wholly unprovided for. That
in January, 1829, J. Carson died without issue, seised and
possessed of certain real estate in Delancy street in the
city of New-York, and also possessed of considerable lease-
hold and other personal estate. That by his will, made
in April, 1827, he authorized his executors, as soon as con-
venient after his death, to sell and dispose of the real es-
ate in Delancy street, and in the mean time and until such
sale to receive collect and recover the rents and profits
due or to grow due thereon. That the executors were further
directed by the will, to place out and invest one third part of
the net proceeds of the sale of such real estate at interest, upon
security by bond and mortgage, or upon particular stocks men-
tioned in the will ; and to pay the interest, or dividends, to
the complainant, for her sole use, during her natural life : Pro-
vided, and it was by the will declared, that this provision for
his wife should be in full recompense and bar of all dower and

right of dower which she might claim out of the real estate of the testator. That the will did not refer to the allowance for alimony, contained in the articles of separation, or make any other provision for the complainant. And that the residue of the estate was given, by the will, to the collateral relatives of the testator. The complainant claimed the provision made for her in the articles of separation, and also the provision made by the will in lieu of her right of dower in the real estate. And she claimed the right to elect, if she was not entitled to both. By the answer of the two executors who proved the will, they admitted that the complainant and the testator agreed to separate at the time specified in the bill, and that articles of separation were entered into between the parties, as they were informed and believed. But they further stated that never having seen the articles of separation, and having heard different accounts as to the contents thereof from the lawyer who drew such articles of separation, who alleged that the allowance for alimony was for the joint lives of the complainant and her husband only, and from others who supposed such allowance to have been for her natural life, they were unable to decide what were her legal or equitable rights; and that they were embarrassed in the settlement of the estate on account of that claim. That they had repeatedly offered to allow the complainant's claim of dower, or to pay her one third part of the accruing rents and profits of the real estate, which she had uniformly refused to accept. That they had been compelled to litigate this question, as the legatees were in Europe, and some of them were infants; and the articles of separation were alleged by Bailey to be lost or mislaid. The executors therefore submitted themselves to the decision of the court. Bailey put in an answer, by which he admitted the agreement to separate. He stated that himself and J. P. Dixon and J. Elliot, were chosen arbitrators, by the husband and wife, by a written agreement. That by the agreement it was submitted to them to settle the terms upon which the parties should separate. That the arbitrators made an award in writing, in which, among other things, they decreed and

awarded that the husband should pay to the wife $125 per annum, in quarter yearly payments, during her natural life, as and for alimony and in full of all demands ; in considera- tion of which it was also awarded that the complainant should relinquish all further demands and claims against the hus- band or his heirs or executors, &c. That the draft of the award was handed to a lawyer to be reduced to form, and that it was put in form by him. That it contained the substance of their award ; and the arbitrators then signed and executed the same ; and that it contained a provision for the con- tinuance of the alimony for the life of the wife. That the husband and wife signified their assent to the award by a written agreement endorsed thereon, under their respective hands and seals. That the award and bonds of submission were received by the defendant Bailey, with the consent of the arbitrators and the parties ; and he was to see that the terms of the award were carried into effect. That the defend- ant Bailey shortly afterwards removed to Upper Canada, and that the papers had been lost or mislaid by him, and could not be found, after diligent search. That he was appointed ex- ecutor, but that he had not proved the will or assumed the trust, and he therefore disclaimed all interest in the controversy. The other two arbitrators were examined as witnesses for the complainant ; and the cause was heard before the vice chan- cellor upon pleadings and proofs. A decree was made, de- claring the right of the complainant to the $125 per annum, for life, in addition to the one third part of the rent or income of the real estate.

*D. Graham, jun.* for the complainant. It may be urged by the defendant that the articles have not been properly proved. The answer to this is, that evidence of their contents was giv- en without objection ; and an objection now is too late. The 85th rule of this court provides as to objections before an ex- aminer, giving him the right to decide upon questions of evi- dence, and throwing upon the party the peril of proceeding, notwithstanding the examiner's decision. And in *McKee* v. *Nelson,* (4 *Cowen,* 355,) it was held, that after a question has been put and answered without objection, it is too late to ob-

ject to its repetition, and much more to the admissibility of the previous evidence. So in *Jackson* v. *Davis*, (5 *Cowen*, 123,) and *Jackson* v. *Jackson*, (*Id.* 173,) it was held, that if an objection which can be obviated by proof, be not taken, or not persisted in at the trial, it will not be received as the ground of a motion for a new trial. And in *Jackson* v. *Cady*, (9 *Cowen*, 140,) where the question was as to proof of a deed, and a witness was allowed on the trial to compare hand writing without objection, the court held such evidence as having been given by consent.

The articles were valid, and will be enforced. It is conceded by the appellant's counsel, that in England it is well settled that the provision made for the subsistence of the wife, by articles of separation, will be enforced; but considerable reliance is placed upon the fact that the judges have expressed their regret at the existence of the rule. If the English authorities on this subject are to be regarded as law, there is an end to the question. Clancy says, "If the husband and wife agree to separate, and do separate accordingly, and if he have agreed to pay to her an allowance during such separation, equity will exact a due performance of the latter part of the contract, namely, the payment of the allowance so long as the separation continues, although, if the bill prayed a decree of separation, it would be so far dismissed on the ground of the illegality of this part of the agreement." And however strange it may appear, as Sir William Grant observed in the case of *Worrall* v. *Jacob*, (3 *Meriv.* 256,) that the agreement for separate maintenance, which is merely auxiliary, should be enforced, whilst the principal agreement, viz. for separation, is held to be contrary to the spirit and policy of the law, yet the decisions on the subject seem too numerous and uniform to be easily shaken. And the cases which he cites in pages 399, 404, leave no room to doubt that this question is, as far as the English courts are concerned, well settled by a series of decisions both before and since the revolution. The same principle has also been recognized by the king's bench in Ireland, in the recent case of *McDonnell* v. *Murphy*, (2 *Fox & Smith's Rep.* 279,) in which Bushe, chief jus-

1832.

Carson
v.
Murray.

tice, reviews all the cases on the subject, and concludes by observing that "such separation deeds as that now before us, whatever might be suggested against them if the question were *res integra*, are now, to use the expression of Lord Ellenborough in *Rodney* v. *Chambers*, (2 *East*, 297,) inveterate in the law, and cannot be questioned." It is true, that in *Durant* v. *Titley*, (7 *Price*, 577,) the exchequer chamber determined that articles which held out a premium to separation were not to be sustained; being considered as directly contrary to the policy of the law. But in *Jee* v. *Thurlow*, (2 *Barn. & Cres.* 547, 4 *D. & R.* 11,) and in *McDonnell* v. *Murphy*, above referred to, that case is considered as standing on its own peculiar facts; and Abbott, chief justice, in the former case remarks, that the exchequer chamber in *Durant* v. *Titley* did not intend to shake the general principle. And the case of *Westmeath* v. *Westmeath*, (1 *Dow. & Clark*, 519,) does not militate against this principle. It is true that Lord Eldon expresses the same regret which he had before intimated in other cases; but notwithstanding this, he fully sustains the law as established by the long current of authorities above referred to. But no question was raised, nor was any opinion on the subject expressed by the house of lords.

In *Blaker* v. *Cooper*, (7 *Serg. & Rawle*, 500,) the husband had obligated himself by bond to a trustee, on a separation from his wife, to pay to the trustee in trust for the wife sixty dollars a year by half yearly payments during her life. The parties were afterwards divorced; and a suit having been brought for one of the instalments, it was contended that the husband was discharged from his obligation by the divorce; but the court ruled that he was still held, and gave judgment for the plaintiff. In *Nichols* v. *Palmer*, (5 *Day's Rep.* 47,) the question was distinctly presented to the supreme court of Connecticut upon articles of separation, by which the husband bound himself to support the wife "forever hereafter," and the legality of such a provision was fully sustained. "It is objected to the declaration, says Baldwin, justice, that it exhibits a contract, depending for its basis on an agreement between husband and wife to part, and live separate. It is contended

1832.

Carson
v.
Murray.

that such an agreement cannot be recognized as of any valid-
ity, because sound principles of policy forbid it, as *contra bonos
mores*; and that of course, all contracts engrafted upon such
a stock, must also be void. I admit that contracts between
husband and wife simply cannot be enforced ; yet, where
such agreements are executed by the intervention of a trus-
tee, I contend that the contract with the trustee is not neces-
sarily void. The doctrine of separate maintenance, by the aid
of a trustee, is found in the earliest records of English juris-
prudence. Such contracts have for ages been protected and
enforced in the English courts of chancery ; and when collat-
erally brought in question in courts of law, they have been re-
cognized as the basis of legal adjudications. So far have been
the courts in England from questioning the efficacy of such a-
greements to support a contract for maintenance, that a very
different question has agitated them in modern times, to wit,
the capacity of the wife during such separation. When we find
thus a practice of this sort long used and universally recognized
in the courts of that country from whence we derive the princi-
ples of our common law, we ought to be clearly satisfied that
it is opposed to principle before we reject it." " Contracts,"
says Smith, J., " between the husband and some third person
for the separate maintenance of the wife, have the uniform
sanction of the courts in England from the earliest period of
their jurisprudence, and is a part of the ancient common law.
In this country, it is believed that our ancestors have been in
the habit of making similar arrangements from the first settle-
ment of the country, and many exist at this time in various
parts of the state, which have been made in pursuance of this
usage. Such being the common law of England at the time
our ancestors emigrated from that country, and such having
been the usage in this country ever since, it ought now to be
binding on our courts as the common law of the land. If any
evil is apprehended in suffering such arrangements to be made
in future, the legislature may interpose and make such regu-
lations as they think proper, which, by a regular promulgation
of the law, will apprise our citizens of what they are to expect.

I am so far, however, from believing that legislative interposition will be necessary on this subject, that I confidently believe no evil has yet been experienced, and that none is to be apprehended." "If," says the same judge, "these arrangements for separate maintenance can be kept within this boundary, they will not become more common than what is absolutely necessary; and probably not more so than they have been in this state from the first settlement of the country." It is the right to give a wife separate property, to manage independently of her husband, which induces so many husbands and wives of fortune in England to live separately, and which introduces a state of things so much to be regretted in that country; and it was this principle which the court intended to resist by their decisions in the cases of *Dibble* v. *Hutton*, (1 *Day's R.* 221,) and *Fitch* v. *Brainard*, (2 *Id.* 163,) determined some years since. It was the new principle of the wife's separate property, separate rights, and her independent legal existence, which the court thought not proper to incorporate into our system. It was this which the court say had grown up in England since the emigration of our ancestors; and of course they could not have brought it with them to this country. It was this which the court say "was at once the cause and effect of licentiousness." But in the decision of both these cases, the court proceed expressly on the ground of adopting the ancient common law, and only of rejecting the modern refinements upon the marriage institution. In this state, also, the applicability of the decisions in England upon the subject has been uniformly assumed. "The validity of these provisions," say the supreme court in *Shelthar* v. *Gregory*, (2 *Wendell's Rep.* 424,) " for the separate maintenance of the wife, when the separation has actually taken place, was recognized by the court in *Baker* v. *Barney*, (8 *John. Rep.* 73.)"

But if the question can be at all regarded as open, there is another ground upon which provisions of the nature in question can be sustained. It is conceded that the husband is in all cases bound to support the wife, unless in case of forfeiture by her own misconduct; and it is equally certain that the relation of husband and wife is, *ipso facto*, a letter of credit to

the wife for necessaries adapted to the sphere in which it is proper she should move. Why then cannot the husband restrict the amount of his responsibility, by fixing a precise sum beyond which he shall not be answerable for the wife's support? That such a settlement would protect him from further claims is well settled. "If," say the supreme court in *Baker* v. *Barney*, (8 *John. Rep.* 73,) "the husband and wife part by consent, and he secures to her a separate maintenance, suitable to his condition and circumstances in life, and pays it according to agreement, he is not answerable even for necessaries, and the general reputation of the separation will be sufficient." The same principle is fully recognized in *Todd* v. *Stokes*, (2 *Salkeld*, 116,) *Nurse* v. *Craig*, (1 *N. Rep.* 148,) and *Holt* v. *Brien*, (4 *Barn. & Ald.* 252.) The effect of this provision, therefore, is most clearly to protect the husband, and to reduce to a certainty the extent of his liability, which otherwise would be vague and undefined. Besides, it is not creating a new duty or liability to which the husband was not subjected before. The living separate is not the consideration of the alimony: that is founded on the conjugal relation; and all that the contract of separation does, is to give it a more available shape, and to define and liquidate it for the convenience of both.

It should also be remembered that the grounds of policy which in England have occasioned the regret of the judges, are inapplicable here, from the fact that there an ecclesiastical jurisdiction exists, which has power to restore the parties to their marital rights, and which is in some measure at variance with contracts of this description. Here, however, no such jurisdiction exists; and when the parties have once separated, no court can compel them to live together. And the policy of the law, as well as the necessity of the case, requires that every provision made by the husband for the support of the wife should be enforced.

If these views are correct, it cannot be readily perceived how any objection can exist to the provision after the death of the husband.

1832.

Carson
v.
Murray.

But it has been said that the parties had not separated when the provision was made. The evidence is full that the separation and provision were simultaneous; and in all the cases above referred to, where the agreement was sustained, it expressed that the parties had agreed to separate. The only object of the articles in this case was to give the separation legal effect, and to make a suitable provision for the wife. The case is not like that of *Durant* v. *Titley*, or even of *Westmeath* v. *Westmeath*, where the parties were living together, and the articles provided for a future separation, at the option of the wife ; thus holding out a premium to the violation of the marriage contract, and the subversion of the policy on which it is founded. It more resembles that of *Rodney* v. *Chambers*, where the court remark, with approbation, upon the fact that discreet friends were consulted upon the separation, and the case of *Jee* v. *Thurlow*, where great stress is laid upon that fact in sustaining an agreement of this description.

The complainant is entitled, in addition to the alimony secured by the articles of separation, to the further provision contained in the will. No notice being taken of the alimony in the will, that provision stands as it did before. It is not expressly excluded, and the law will raise no intendment to that effect, but will presume that no exclusion of the previous provision was contemplated, especially in a case like the present, where there is no issue of the marriage, and where the claimant is an aged female, asking subsistence out of the property of her husband, to the acquisition of which she mainly contributed. That the widow will not be barred of her dower by the previous provision in the articles of separation is clear. In *Adsit* v. *Adsit*, (2 *Johnson's Ch. Rep.* 448,) it was held, that where a testator gave to his wife $500, "to be left in the hands of his executors, to be paid for her support at any time, or at all times, as her need might require," and also gave her what household goods she needed ; and after bequeathing pecuniary legacies to his grand children, directed his farm, &c. to be sold by his executors, who sold it for $6000, and the wife, after the death of the

testator, accepted the legacy, which was paid to her out of the proceeds of the sale of the farm; it was held, that the legacy was not, according to a fair construction of the will, given in lieu of, or in bar of dower, but as a mere pecuniary bequest; that the acceptance of it by the widow did not affect her right to dower; and that the purchaser of the farm took it subject to the claim of dower. And Chancellor Kent, after fully reviewing all the authorities on the subject, establishes the general principle, that where a legacy to the wife is not declared by express terms to be in lieu of dower, it will not be so intended, unless such intention can be deduced by clear and manifest implication from the provision of the will, so that the claim of dower would be inconsistent with the will, or repugnant to the dispositions made by the testator.

And in the recent case of *Jackson* v. *Churchill*, (7 *Cowen's Rep.* 287,) which was an action of ejectment for dower, the defendant gave in evidence the will of the lessor's husband, in whose right she claimed, whereby he bequeathed to her his dwelling house, during her life, or widowhood, and also a part of his personal property; and offered to shew that the lessor had accepted the provision in the will, and continued to enjoy it; and contended, that though it was not in terms declared to be in lieu of dower, yet that such was the manifest intention of the testator. Yet the supreme court held, that the dower was not barred; and Savage, Ch. J. observes, (*p.* 290,) "There is in this provision nothing inconsistent with her claim of dower. The devise to the sons will be less valuable; but that constitutes no objection. There is no incongruity in enforcing the claim for dower, and the devise. The two may stand well together; and it may fairly be inferred that the testator intended the devise as additional to his wife's claim for dower. The same rule prevails in *Pennsylvania.* (1 *Dall. Rep.* 418. 1 *Yeates*, 424.)" If, then, the dower itself would not be barred, it is difficult to perceive how a provision in lieu of dower can be affected by implication. It must stand upon the same principles, and be tested by the same rule of construction. If so, we look in vain for any thing like an exclusion in the will. The provision in the will is in lieu of

dower, and is not only consistent with the right to alimony,
but it manifestly was the intention of the testator to superadd
it as a further provision.

A point was made by the appellants as to the right of the
complainant to dower under this bill, on the ground that the
proper parties were not before the court. It will be observed
that no decree was made for dower by the vice chancellor, but
that it was confined to the provisions in the articles of separa-
tion and in the will. If it should, however, be necessary to
recur to the claim of dower, we contend that the real estate
having been devised to the executors, with power to sell, and
its proceeds being turned into mere personal devises to others,
the court should give it the construction of a devise, and that
it would, upon that principle, be authorized to decree dower.
Dower, however, is not the distinct object of this suit. It is
in the first instance to secure to the complainant the alimony
provided in the articles, and the devise in the will in lieu of
dower. But if the complainant is not entitled to the provision
in the will, together with the alimony, it is respectfully urged
that she is entitled to her dower, in addition to the alimony.
(*Vide Schauber* v. *Jackson*, 2 *Wendell's Rep.* 34.)

*H. W. Warner*, for the defendants. The plaintiff can in no
event have dower, under the present bill, because the realty
is not represented in court. (1 *R. S.* 729, § 56, comment-
ed on in 4 *Kent's Comm.* 315.) She cannot take under the
supposed articles of separation, and under the will also, but
must elect, even supposing the articles (so called) were valid.
See, in general, (*Clancy, ch.* 6, *p.* 230.) Where there was
a devise "in lieu of all other claims," the devisee, (the wife of
the testator,) was required to elect between it and a settled
estate. (*Newman & Newman*, 1 *B. C. C.* 186. *See also*
*Whistler* v. *Whistler*, 2 *Vesey, jun.* 367.) And the circum-
stance of the two provisions agreeing in this, that they are both
for the wife's support, &c. is sufficient to make the testamen-
tary provision exclusive of the other, i. e. evidence of intent,
&c. on the part of the testator. (2 *John. Ch. Rep.* 448.) The
agreement, if any, provided that the plaintiff should release

all other claims in the nature of dower; that is, all other claims for a support, &c. On the other hand, the will provides for her support, giving her the use of one third, &c. in lieu of dower; that is, by way of compensation. This compensation, if she elect to accept of it, is surely in the nature of dower. And it would seem to follow, according to 2 *John. Ch. Rep. (supra,)* that she must elect, not only between it and dower, but also between it and the continuance of her supposed life provision of the same nature, under the pretended agreement of separation. Add to this, that the testator, by providing a compensation in lieu of dower, clearly indicated his intent that the previous provision, which was also expressly in lieu of dower, should be abandoned after his death. Otherwise his will, in this respect, would be unintelligible.

It is worthy of remark, also, that the will is so drawn as to leave no property undisposed of; at the same time that it takes no notice of the articles in question, and makes no provision for any annuity arising under them. Nor is it possible to secure such annuity without apparent violence to the testator's views. But is there any legal proof of a separation agreement of any kind? Observe the scope of the bill. It speaks only of a very solemn instrument, tripartite, in the shape of articles of separation. The defendants say they have heard of such articles having been executed, but are ignorant of the facts. If no objection was taken before the examiner to the competency of the proof as to the contents of the articles, still the court will not, on its own account, permit the very first rules of evidence to be violated in this manner, and allow itself to be thus dragged into a mass of perplexed and doubtful testimony which might have been spared.

But let us admit, for a moment, that there was a contract duly proved under the issue? Is it to be held valid? That such contracts are immoral, and impolitic, need not be argued. It would scarcely be respectful to the court to argue a point like that; and I content myself with referring generally to 3 *John. Ch. Rep.* 382. The question is, whether such contracts are of legal force in this country, let the forms and ceremonies of their execution be ever so full and exact. Now, I am war-

ranted in saying, that the general course of the English decisions on this head has been contrary to the present state and tendency of the judicial sentiment of that country. As a few, out of many references that might be given to establish this, I refer to the following : In king's bench, *Jee* v. *Thurlow*, (2 *B. & C.* 547 ;) in the exchequer, *Durant* v. *Titley*, (7 *Price*, 577 ;) in chancery, *St. John* v. *St. John*, (11 *Ves.* 526 ;) *Wonall* v. *Jacob*, (3 *Meriv.* 268 ;) *Westmeath* v. *Westmeath*, (1 *Jacob's Rep.* 126 ; *Same* v. *Same*, (1 *Dow, new series.*) There seems to be a uniform unanimity of disapprobation among the late and present English judges, whenever one of these separation cases comes up. And they allude frequently to the court of last resort, as one to which they look anxiously for a new era of adjudications on the subject. In the house of lords the question of validity, as to these contracts, has not yet been decided ; but it seems fair to presume that the decision, when it shall be there made, will be according to what is now the prevailing sentiment of that country. Indeed, there has been, in the inferior courts, a gradual progress of retrenchment, for some years past, of the latitude of the earlier adjudications. For example : it was once held that a contract of separation between husband and wife alone, without a third party, was valid. The only case, I believe, is *Guth* v. *Guth*, (3 *Bro. C. C.* 620 ;) but that doctrine is now exploded. (*See Legard* v. *Johnson*, 3 *Ves.* 361. *St. John* v. *St. John, supra. Elworthy* v. *Bird*, 2 *Sim. & Stu.* 372. *Clancy*, 420.)

Again ; it was formerly held, that a married woman became, by one of these contracts, a feme sole, so as to be liable to suits at law, &c. *Corbet* v. *Poelintz*, in 1 *T. R.* 5, was an instance, and if my memory serves, the first that occurred, of such a decision. But of this doctrine the courts have long since taken leave. (*Marshall* v. *Rutton*, 8 *T. R.* 545. *Farthorne* v. *Blaquieu*, 6 *M. & S.* 73. *Lewis* v. *Lee*, 3 *B. & C.* 291.) Yet again ; *Rodney* v. *Chambers*, (2 *East*, 283,) and *Chambers* v. *Caulfield*, (6 *Id.* 252,) were cases where contracts for future separation were held valid. But although these cases have not perhaps been directly, and in terms, overruled, yet the law is now well settled that such agreements are void.

(*Durant* v. *Titley, supra. Hindley* v. *Westmeath*, 6 *B. & C.* 200. *Westmeath* v. *Westmeath, supra. Roper*, 278.) And why void? Because against legal policy.

This we see is the tendency of modern decisions, even in England. And may we not fairly expect to witness a consummation of this tendency, in the house of lords, whenever the subject shall be brought within the power of that tribunal? What, then, should be our course in this country? Ought we to follow the English decisions as they stand; or decide upon principle at once, and give to policy and good morals the same control over a contract for a present separation, as in England itself they are allowed to have over those for future separations? At any rate, this court is not obliged to lend its aid to carry into effect such a contract. If the complainant has legal rights, let her go to law for the assertion of them. The jurisdiction she appeals to here, is of a discretionary nature; and if there be reasons of policy or morality against her demands, the court is at liberty to refuse its interference.

The complainant's case wants one feature which belongs, I believe, to every English case in which the contract has been supported; that is, the *sævitia* of the ecclesiastical law; being, in effect, the *cruelty*, &c. of our statute. Is it not a rule of the English practice, never to decree maintenance where the separation and living apart is voluntary and without necessity? (*Duncan* v. *Duncan, Cooper*, 254.) The bill speaks of unhappy differences, but ascribes no blame to the husband; much less does it show that the complainant could not live with him. Is this sufficient? Will the court reward her, not only for violating her duty, but for doing this gratuitously, without cause? May the solemn bond of matrimony be thus trifled with, under the eye of the court and with its approbation? Nay, is it in the power of the court to give any sanction to a separation which it could not possibly decree under the statute? How can the court do that, with the concurrence of the parties, which is placed by the statute utterly beyond its jurisdiction? Can the consent of the parties give jurisdiction? Must there not be what is called the statute

1832.
Carson
v.
Murray.

cruelty, &c. before the court can ratify or any way assist a contract of this kind ?

In the next place, such a contract, if any thing, is a contract at the will of the parties, while they live. Its existence, and even an attempt to enforce it at law, is no obstacle to a suit in the ecclesiastical court for restitution. (1 *Haggard*, 760. 2 *Idem*. 115, *sup*.) Nor will chancery enjoin such a suit. (*Clancy*, 395. *Fletcher* v. *Fletcher*, 2 *Cox*, 107.) *Westmeath* v. *Westmeath* was, I believe, an example in point. And though we have no ecclesiastical jurisdiction, yet there is another point of view in which the voluntary character of such con- tracts may be shown ; for a tender by the husband, during the joint lives, to take his wife back and use her kindly, puts an end to her stipulated alimony. (*Whorewood* v. *Whorewood,* 1 *Ch. Cas.* 250. *Head* v. *Head,* 3 *Atk.* 295.) Indeed, I feel warranted in saying that the agreement in the present case was at the husband's will, by its very terms. Now can such a contract be supported and enforced here ? Suppose the ap- plication had been against the testator in his life time, not only to compel him to pay the allowance but to respect the obligation of letting her alone and not troubling her ? And unless his death is to be construed into a determination of his mind in her favor, on this head of adhering to the supposed agreement, I do not see how the court, with reference to spe- cific execution, can regard the matter as at all altered by his death. What the contract was in its original nature such it still remains.

Again ; it was provided that the parties might come to- gether on occasions of sickness. This was an express provis- ion contained in the agreement for its own breach. Nor is there any account given us in the bill, or in the proofs, how of- ten the rigor of their separation was mitigated by the use of this charitable licence of coming together. The award says it must only be in a case of sickness. But sickness in what degree, and in what part of the system ; whether unto death, or only unto the desire of conjugal musing, we are not inform- ed. Each party, however, was to be judge of the matter for himself, and without appeal ; which is equivalent to saying that they were to come together when they pleased. And I

do not find the precaution used of securing the attendance and vigilance of Bailey, ('ycleped the trustee) on these occasions. And this is a contract which a court of chancery is solemnly called on to enforce ! Now, it is well settled that a single relaxation of the rule of living separate, amounts to condonation, and terminates the contract even at law. (2 *Wendell*, 422.) And in the case of *Westmeath* v. *Westmeath*, it was considered that a contract of this nature, however formal and sufficient in other respects, was utterly destroyed by a provision therein, not for bringing the parties together, but even for allowing them to dwell for a few days in separate apartments under the same roof.

Another remark, that seems to me entirely conclusive by itself, respects that part of the arrangement in question that is said to render it tripartite by the introduction of Bailey as trustee. Trustee of what ? Of nothing. He was to see the arrangement carried into effect. There was no property conveyed, and no responsibilities created. If at any future day the quarterly allowance should be handed by Carson to Bailey, the latter was then to hand it over to Mrs. Carson. This was the whole length and breadth of the trust ! Otherwise, Bailey might have sued the executors at law, or might have been a substantial defendant here ; whereas now he is a mere witness, and ought not to have been made a defendant. In short, there was no third party, no trustee, in the case. Of course the contract, if any, is between husband and wife. But that is impossible. (1 *Day's Rep.* 221.)

Finally, the English cases on this subject go no further than to decree accounts of arrears of alimony in favor of the wife. There is probably none to be found that sanctions, in any respect, the future perseverance of the parties in living apart. Now, although Carson is dead, yet a decree against the executors as prayed would be a prospective decree upon a contract of voluntary separation—a thing of which no example has been set. Shall this be done ? Shall any thing, at the very utmost, be done beyond the constraint of positive authorities, when policy, morality, religion itself, cries out against the measure ? Supposing the contract valid, still it gave the wife no estate—nothing within her power to convey.

1832.

Carson
v.
Murray.

Even if there had been an estate vested in a trustee for her benefit, she would still have had only a maintenance. (*Hyde v. Price, 3 Vesey,* 437.) How then has the husband's death availed to convert this mere maintenance into an estate in her ? During the joint lives of the parties, it would be dangerous in the extreme to allow of the permanent vesting of estates by separation agreements ; for that would destroy the hope always entertained, that the parties might return to their conjugal duties. It will perhaps be said, that as the death of one of the parties takes away this hope, there is no subsequent impolicy in turning her maintenance into an estate. Still, as she takes alimony if at all under the contract, she can only take now what the contract, if any there was, originally provided in her favor ; and that is maintenance. This, however, would not allow the executors to perform the will and be quit of their duties during her life. The bill therefore claims, not alimony, but an estate for life—something that she may have absolutely secured to her, and which, instead of preserving it for her maintenance, she may give away or sell at her pleasure. Indeed, regarding the supposed provision as alimony, there is nothing in arrear ; because the payments were complete to Carson's death. From the nature of the case, therefore, if any thing be decreed to her, it must be by way of prospective execution, &c. and vesting her with an absolute estate in the subject. This is more than has ever yet been done ; and more, as I trust, than ever will be done in circumstances any way resembling those here presented.

THE CHANCELLOR. It may well be doubted whether public policy does not forbid any agreement for a separation between husband and wife, except under the sanction of a court of justice ; and whether it does not also require that such agreements should be limited to those cases where by the previous misconduct of one of the parties the other is entitled to have the marriage contract dissolved, either wholly or partially, by a decree of the competent tribunal. The late lord chancellor of England, the Earl of Eldon, expressed his opinion very freely on this subject, in the case of *Lord St. John* v. *Lady St. John,* at the time he first held the great seal, (11 *Vesey,*

526.) He reiterated the same opinion sixteen years after-wards, in the case of *The Earl of Westmeath* v. *The Countess of Westmeath,* (*Jacob's Rep.* 126.) And as late as 1830, in a subsequent suit between the same parties in the house of lords, on an appeal from Ireland, he again took occasion to expess his astonishment that the doctrine should ever have prevail-ed, that the parties to a marriage contract might, by an agree-ment between themselves, destroy all the duties and obliga-tions of that important and sacred relation, not only as it re-garded themselves but their children also. (1 *Dow & Clark's Rep.* 544.) It has, however, long since become the settled law in England, that a valid agreement for an immediate sep-aration between a husband and wife, and for a separate allow-ance for her support, may be made through the medium of a trustee. And as many of the decisions which have gone the greatest length on this subject took place previous to the rev-olution, they have been recognized here as settling the law in this state to the same extent. (*Vide Baker* v. *Barney,* 8 *John. Rep.* 73. *Shelthar* v. *Gregory,* 2 *Wendell's Rep.* 422. 2 *Raithby's Vern.* 386, *n.* 1.) I do not, therefore, feel myself at liberty to follow the opinions of the judges of the present day, as to the policy of supporting such agreements, in opposition to the law as settled by their predecessors; though I would not consent to extend the principle beyond adjudged cases. According to those cases, agreements for separations cannot be supported, either at law or in equity, unless the separation has already taken place, or is to take place immediately upon the execution of the agreement. The contract will also be considered as rescinded, if the parties afterwards cohabit or live together as husband and wife, by mutual consent, for ever so short a time. And the husband will, in that case, be restored to all his marital rights, to the same extent as if no separation had ever taken place. Testing the a-greement in this case by these principles, I cannot see that there is any thing in the contract, as proved, to render it invalid. It appears to have been an agreement for an im-mediate separation ; the amount of alimony to the wife, and the particular mode of carrying it into effect, to be set-tled by arbitrators selected by the parties. Those matters

1832.

Carson
v.
Murray.

were settled by the arbitrators; and the substance of their award is now established by the testimony of two of them, and by the answer of the third who was selected as the trustee for the wife. The precise terms of the written instrument afterwards prepared and which was signed by both parties and the trustee as well as by the other arbitrators, cannot now be ascertained, in consequence of the loss of the instrument by the trustee in whose hands it was placed. But as it appears a lawyer was employed to put it into form, in the absence of all proof to the contrary, I think that it may fairly be presumed there was a covenant on the part of the husband, with the trustee, to pay the annuity to the wife for life, in lieu of dower and of all other claims upon the estate of the husband either before or after his death, according to the terms of the award. The separation took effect immediately, and the parties do not appear to have lived or cohabited together as husband and wife afterwards. It is supposed by the appellants' counsel that the provision in the articles of separation for visiting each other in case of sickness, was intended as a reservation of the right of occasional cohabitation by mutual consent. Even if he is correct in that conjecture, I do not see that it would vitiate the contract. If such an arrangement had in fact been carried into effect, by sexual intercourse after the separation, it might indeed have rescinded the agreement, notwithstanding the express stipulation to the contrary which was contained therein. But as neither party had the right to visit except by mutual consent, even in case of sickness, the reservation could not destroy the agreement if either declined to receive or return the visits of the other. And there is no evidence that the parties ever acted on that stipulation in the agreement. The answer of Bailey, the trustee, was not evidence against the executors. And if they had objected to the giving of parol proof as to the contents of the agreement, on the ground that there was no legal evidence of its loss, I think the objection might now be sustained. But had that objection been made in season, it would have been a matter of course to have permitted the complainant to examine Bailey as a witness to prove the loss. His answer shows what probably must have been his testimony on that

subject. As this was, under the circumstances, mere matter of form, and as the parol evidence was received without objection, I think it would be unreasonable to permit the executors to raise that question for the first time at the hearing. The vice chancellor was therefore right in declaring the complainant entitled to an allowance of $125 per annum for life, commencing at the time of the death of the testator; up to which last period it had been paid by the executors.

The next question is, whether the provision in the will was intended to be cumulative, or only in lieu of the allowance for the support of the wife contained in the articles of separation. To understand this provision, it is necessary to inquire what was the situation of the parties after the deed of separation, and at the time of making the will. The complainant alleges, in her bill, and all the witnesses agree as to this fact, that the $125 annuity was to be in lieu of all other claims upon the estate of the husband, for dower or otherwise, as well before as after his death. She also alleges that she did in fact execute a release of her dower, and all other claims, agreeably to the award. It is evident, however, that she could not execute any valid release of her dower in the real estate of her husband in any other way than by joining with him in a conveyance to a third person. And even if that was done, the right of dower would again attach upon a re-conveyance of the property to the husband at any time during the existence of the marriage contract. Although it is probable that a release of dower, &c. was contained in the deed of separation, for the purpose of putting the wife to her election if she should afterwards claim both the annuity and dower, it is very certain that her legal right of dower actually existed notwithstanding the release. And the testator was, probably, informed that such was the fact, by his legal adviser who prepared his will. It appears by the answer of the defendants that the real estate out of which the provision in the will, in lieu of dower, was to be made, was worth about $2000. The income of one third of this, invested in the manner contemplated by the testator, would be considerably less than half of the annuity stipulated for in the articles of separation. It is therefore hardly possible to suppose that the testator could

have expected the wife would elect to receive this inadequate provision in lieu of the annuity.    And in the will the testator speaks of his wife in terms of great kindness and affection, notwithstanding the separation.    I must therefore presume it was his intention to give her this as an additional allowance for her support, or as an inducement to her to relinquish her legal claim of dower; and thus to prevent any future litigation upon the question whether she was bound to elect between the annuity and her dower.    There is nothing in the will from which it can be legally inferred that the testator intended to make this provision in lieu of the annuity, as well as in bar of the legal right of his wife to dower in his estate. And this provision is not inconsistent with her right to claim the annuity; for the payment of which the defendants admit the testator left sufficient property independent of real estate. She cannot therefore be compelled to elect between the annuity and the allowance made by the will, but is entitled to both. There can be no difficulty in making a final settlement of the estate, so far as respects the annuity, without waiting for the death of the annuitant.    The executors may at once take from the estate of the testator, in their hands, a sum sufficient to purchase an annuity for the life of the widow.    And if it had been asked for in the court below, I presume the vice chancellor would have directed a gross allowance, equal to the value of the annuity, to have been paid to the complainant in lieu of the payments hereafter to become due thereon. As the whole provision claimed by the wife is barely sufficient for her support, and she was compelled to come into this court to obtain that provision, it would have been unreasonable to have required her to pay her own costs.    They were therefore properly charged upon the estate in the hands of the executors.

The decision of the vice chancellor must be affirmed with costs; which costs are also to be paid out of the estate of the testator in the hands of the appellants.    As the further proceedings in the cause, under the decree of the vice chancellor, will not probably produce any other litigation, so as to require the case to be again brought before the court, the consequential directions upon the confirmation of the master's report be-

ing all contained in the original decree, it will not be necessary to remit the cause to the vice chancellor. The decree may therefore be enrolled and carried into effect here.