## SAYLES v. SAYLES.

A contract, having for its object the dissolution or determination of the marriage relation, and holding out a premium therefor, and designed to promote and facilitate that result, is against the policy of the law, and illegal, and will not form a valid consideration for a promissory note.

Where W. S. commenced a libel for a divorce against his wife, and while the same was pending, the libellee appeared by counsel to make defence, and the parties entered into an agreement, that the libellant would pay the amount of a promissory note, executed at the time by the libellant, provided the libellee would withdraw her defence, and the libellant should obtain a decree of divorce, and the libellee thereupon withdrew her appearance, and a divorce was granted; it was *held*, that the consideration of the note was illegal and the note void.

ASSUMPSIT for money had and received. On the general issue, the plaintiff produced and proved the signature of a note,

of which the following is a copy: "August 9, 1844. For value received I promise to pay Albert W. Sayles, or order, four hundred dollars on the 1st of October, 1847, with interest; and it is further agreed, that said Willard Sayles may have the privilege of paying this note at any time previous to the day above mentioned, if he sees fit." (Signed) "Willard Sayles."

Micajah M. Smith was called as a witness by the defendant. He testified that he had seen the note, and had it in his possession. In August, he thought, at the date of the note, a Mr. Blaisdell and Dr. Sayles, the defendant, came to his house and said they had made an agreement in relation to a petition then in court, in favor of Dr. Sayles against his wife. By this agreement, they were to withdraw opposition to his obtaining a divorce from his wife. Dr. Sayles was to make a note for $400, and a mortgage of his farm to secure it, and an agreement to give up to the wife, or to Albert, her son, the household furniture she had at Lowell, and if Dr. Sayles obtained a divorce, the witness, with whom these papers were to be left, was to deliver them to the plaintiff or his order. Two or three months after, he asked Dr. Sayles if he had got a bill, and the Doctor said he had; and in the winter following Mr. Blaisdell came to his house and he delivered the papers to him.

On cross-examination he said the bargain was made before they came to his house, except as to the household stuff. The Doctor said he ought not to give $400 — he was not worth enough — he was not able to give so much. Mr. Blaisdell said he was able; that if Dr. Sayles failed in his petition, she would still be his wife; she would be sick, and he might have to pay $400; but if he got a bill, he would be clear of her, and it would be money well laid out.

The Doctor agreed to pay half the costs of Mr. Blaisdell, and paid the money to the witness.

The plaintiff then called said Blaisdell, who testified that the note was in his handwriting. Some time in the season of 1844, Mrs. Sayles applied to him, through his brother, who lived at Lowell, to appear for her at the court, on a petition for a divorce, filed by Dr. Sayles against her, not for the purpose of making

26*

a defence, but to obtain some allowance for her support; and he did appear for her in July or August. He did not see her personally. As Dr. Sayles applied for the divorce, he was puzzled to get alimony, and the case was on his application, continued *nisi* to Concord, his object being to ascertain the Doctor's means, and get an allowance at Concord, if he could. He did not recollect, that he had any conversation with the Doctor at Plymouth, but they met at a tavern on their way home, and had conversation, the substance of which was, that the witness told Dr. Sayles it was settled, that he and his wife could not live together, and that she was infirm, and would be chargeable to the public, or her friends, or children, and probably her son Albert, the plaintiff, would have to support her. He spoke to him of the amount of his property, and Dr. Sayles denied being worth so much as the witness said he was. The witness proposed that he should pay $600, and afterwards $500, and Dr. Sayles offered less than $400. The witness said he should apply to the court for an allowance, and Sayles might give $500 or not, as he chose, and Sayles refused. The witness began to make a notice to him to take testimony at Grafton, and the Doctor started for home, and the witness started after him, to serve the notice, and overtook him before he got to Smith's (the former witness,) and they had a further conversation, and Sayles agreed to give his son an allowance of $400, and the witness was to proceed no further in the attempt to get an allowance. Nothing was then said of the furniture or costs. They agreed to go to Smith's to do the writings. There was talk of an expected sale of the property, which led to the condition in the note.

The papers were made out, signed, and lodged with Mr. Smith, for two purposes; first to get the mortgage recorded, and second to hold them till Dr. Sayles got a bill of divorce. If the wife opposed, the papers were to be returned to Dr. Sayles, otherwise to be given up to her.

There was talk of the costs. Witness said they were poor, and had no means to pay him, and Sayles left $12.50 with Smith to pay him.

In the winter following, the witness called on Smith, who gave

him up the note and mortgage, and he sent them to Lowell, inclosed in a letter to his brother, to be delivered to Albert or his mother.

On cross-examination Blaisdell said, he was not employed to make a defence, but to get an allowance. He did not recollect the charges in the bill, nor ever say she was guilty of those charges. He did not recollect what Sayles said — he said many things against his wife, and the witness told him he was as deep in mud as she was, and he doubted if he could get a divorce. The witness said he appeared generally — he did not recollect that he applied for an allowance to defray her expenses — he might have done so. His calculation was not to oppose a divorce, further than to get an allowance. He had some doubts of success. If he defeated the divorce, he got nothing. He must make some defence to get an allowance; and was puzzled how to get at it. He intended to show the Doctor's property, her character, and his a good deal, and did not expect to get the money unless the Doctor got a bill. He could not say it was the object, that the parties should live separate. The Doctor would not have given a cent, merely to live separate, and be free from her support; he wanted a divorce. The bargain went for nothing, if we resisted the bill. There was no agreement that we should not resist the bill, unless it could be inferred, because we got nothing if no bill was obtained. He thought the cause of divorce assigned, was desertion. His object was to show the character of the wife, and he thought he could prove her to be one of the most amiable women in Grafton, and that her husband had abused her without measure. It was no part of the agreement, that they were not to resist the bill, any further than it might be inferred from an agreement not to apply for an allowance. If the Doctor succeeded in getting a bill, and they made no application for an allowance, the agreement was to be in force.

It was then objected by the defendant's counsel, that the appearance of Mr. Blaisdell to the defendant's libel was collusive, and the bargain was against public policy and illegal; that there was no consideration for the note, because there was no

---
Sayles *v.* Sayles.
---

bargain *between* the plaintiff and the defendant, no assent of Albert to maintain his mother, or to receive the note, and no contract can be made between husband and wife ; that it was clear the divorce was to be had by consent, and the bargain could not take effect without a divorce. Blaisdell appeared only to claim alimony, and an agreement to withdraw that application was equivalent to an agreement to withdraw opposition to the bill.

The counsel for the plaintiff desired that the question as a mixed question of law and fact, should be submitted to the jury.

The presiding justice being of the opinion that the contract shown was fraudulent and illegal, directed a verdict for the defendant, to which the plaintiff's counsel excepted, and moved to set aside the verdict returned by order of court, for that cause.

*Weeks,* for the plaintiff.

*Kittredge,* for the defendant.

Woods, J. It is alleged on the part of the defendant, that the consideration upon which the promise in the note declared on rests, was illegal, as being against public policy, and that the note is void for that cause. The note was given upon the consideration, and was to be paid only upon the condition, that the wife of the defendant would withdraw all opposition to the petition of the defendant for a divorce pending at the time against her, in this Court. It may well be inferred from the fact of the agreement, that it was the belief of both parties, that no divorce would or could properly have been granted, if full defence had been made, and that the arrangement made, resulted from that view of the case ; and the facts disclosed by the testimony of the counsel of the libellee fully sustain this view. That witness testifies, that the cause of divorce alleged in the petition, was desertion, as he thought, and that, " he thought he could prove her to be one of the most amiable women in Grafton, and that her husband abused her without measure." It was opposition upon this ground, that was no longer to be insisted upon, but

was to be withdrawn, and was withdrawn, as the consideration of the note in question, and it is quite obvious, that Mrs. Sayles must have believed that her ground of opposition would, if persisted in, and made out in proof, have been entirely sufficient. She could hardly have failed to have received such advice from the learned counsel who had been employed to make her defence. Desertion forms no legal ground of divorce, unless it be without sufficient cause, and it could scarcely be said, that an amiable woman, "abused without measure," had no such cause for deserting her husband. The evidence in this case, pretty fully establishes, indeed we see not how it establishes any other, than a case of collusion between the parties, to obtain a divorce at the hands of the Court, when both parties knew, or had good reason to believe, that no sufficient legal cause existed. No such agreement, even if executed, can form a valid consideration for either a verbal or written promise. The great and principal object of the agreement made between the parties, was to bring about a dissolution of the marriage contract, and to put an end to the various duties and relations resulting from it. Any contract, having any such purpose, object, and tendency, cannot be in law sustained, but must be regarded as being against sound public policy, and consequently illegal and void. The marriage relation is one to be encouraged and maintained, when formed. Such is the well-settled policy of the law; and its dissolution or determination is not to be left to depend upon the caprice of the parties. If determined, it must be done in accordance with some positive enactment of law and in due course of judicial proceedings. The good order and well-being of society, as well as the laws of this State, require this. The collusive character of the proceedings disclosed in this case, if brought to the knowledge of the court, would have furnished abundant and conclusive reasons for denying the prayer of the petition. The decisions in England and in this country, have gone the length of upholding contracts having for their object the separation of husband and wife, *a mensâ et thoro*, and providing for a separate allowance for the wife, through the intervention of a trustee, in cases where the parties are already living separately, or where

the agreement is that the separation shall take place immediately. Such contracts for separation and a separate maintenance have been sanctioned by many early English decisions, and the same doctrine has been followed by several American cases. *Jee* v. *Thurlow,* 2 Barn. & Cress. 547 ; *Rex* v. *Mead,* 1 Burr. 542 ; *Rodney* v. *Chambers,* 2 East, 297 ; *Carson* v. *Murray,* 3 Paige, 483 ; 14 Ohio Rep. 256 ; *Baker* v. *Barney,* 8 Johns. 73 ; *Shelthar* v. *Gregory,* 2 Wend. 422 ; 5 Bos. & Pull. 148 ; 1 Salk. 116.

In delivering the judgment of the court, in the case of *St. John* v. *St. John,* 11 Vesey, 525 ; and *Westmeath* v. *Westmeath,* Jacob, 126 ; and again in *Westmeath* v. *Westmeath,* in the House of Lords, as reported in Dow & Clark, 544, Lord *Eldon* freely expressed his opinion, that public policy forbade any agreement for a separation between husband and wife, except under the sanction of a court of justice. Mr. Chancellor *Walworth,* in *Carson* v. *Murray,* 3 Paige, 483, although he felt himself bound by the authority of the early decisions, which recognize the validity of such agreements for a separate maintenance, declared his unwillingness to extend the principle beyond the adjudged cases. Mr. *Chitty* says, that "an instrument which contemplates and provides for the future separation of husband and wife, or is calculated to promote a future separation, is not legal." Chitty on Contracts, (5th Am. ed.) 672. The case of *Westmeath* v. *Westmeath,* Jacob, 126, before cited, fully recognizes the doctrine as laid down by Mr. *Chitty.* In *Durant* v. *Tilley,* 7 Price, 577, it was determined that articles of agreement which hold out a premium for a separation, are not to be sanctioned, being considered as directly contrary to the policy of the law. So a sealed bill, promising to pay a sum of money, provided the obligee is not lawfully married within six months from the date, was holden to be illegal and void. *Sterling* v. *Simmickson,* 2 South. Rep. 756.

The cases cited, show with what strictness and care the law guards and upholds the marriage relations ; and that no contract, having for its object their dissolution, or calculated to disturb them, can be sustained. In this State at least, a separation

*a vinculo*, can only be effected through a decree of the courts of law. No agreement of the parties can have the effect. Sound policy as well as the established law forbids it, and any agreement made in fraud of the purposes of the law, and against its policy, is illegal and void. The note under consideration, was clearly a contract resting on no other foundation than such an agreement. It must, as has already been suggested, have been well understood by all who took part in the transaction out of which the note sprung, that if the facts of the case were brought to the knowledge of the court, no decree of divorce would be granted. By the agreement, the evidence of the facts touching the cause alleged in the libel, was to be suppressed, and was suppressed ; and the divorce was by that means obtained in a case where, by law, and according to law, it could not have been done. And now, as the fruits of this collusive and fraudulent imposition upon the law and the court granting the divorce, the plaintiff asks the aid of this Court, in enforcing the contract of the defendant. We are, however, aware of no principle of law or justice that will warrant the Court in aiding a party, by its judicial action, to gain possession of what can only be regarded as the fruits of a palpable fraud, practised both upon the law and the court that administered it.

There was no fact in dispute upon the evidence in this case. The case presents nothing but a question of law arising upon an uncontradicted state of facts. There was nothing, then, to be submitted to the jury, and the direction of a verdict for the defendant, by the court below, was well authorized by the practice in this State.

*Judgment on the verdict.*