## NEW YORK COMMON PLEAS.

MARY E. GOULD, appellant agt. EDWARD S. GOULD, respondent

A *married woman* cannot sue her *husband at law*. Therefore, a married woman living apart from her husband, cannot maintain an action of *ejectment*, to recover leasehold premises which are her *separate property*, and of which he holds possession. (DALY, *J. dissenting.*)

*General Term, May,* 1865.
*Before* DALY, *F. J.,* BRADY *and* CARDOZO, *Judges.*

APPEAL from the judgment of the special term dismissing the plaintiff's complaint. This action was brought to recover the possession of the leasehold premises No. 186 Clinton Place, and was in the nature of an action of ejectment. The leasehold had been settled upon the plaintiff by her father, Cornelius Du Bois, in 1842, "to have and to hold the same, and the rents, issues and profits of said premises unto the said Mary Elizabeth Gould, for the term of her natural life, to her sole and only proper use and benefit and behoof, free from all interference of her said or any future husband" &c.

The plaintiff and defendant were married in 1833. They lived together in this house from 1836 to 1855. They had two children. In 1855 an agreement for an amicable separation was entered into between them. This agreement was offered in evidence by the plaintiff, but excluded by the court, on the ground that it was void because it contemplated a separation on a future day. In July, 1855, Mrs. Gould left the house and went to Europe, being accompanied by her daughter, who was of full age, and by her son, aged eighteen, and there she has since resided. Mr. Gould remained in the house, and refused to give up the possession thereof. This action was brought to recover the possession of the premises, with damages for the withholding thereof. It was tried in 1861, before BRADY, J., and a jury, and he dismissed the complaint upon the grounds:

First. That the evidence established that the plaintiff and defendant were husband and wife, and that this action could not be maintained.

Second. That the plaintiff's remedy is in equity, and not in law.

LEWIS L. DELAFIELD, *for the appellant.*

I. Under these conveyances Mrs. Gould held the premises as her separate property, entirely independent of her husband, who had no legal or equitable title therein. These points have been determined in her favor in two cases decided at the general term of the supreme court. (*Vandervoort* agt. *Gould, February Term,* 1862; *Gould* agt. *Vandervoort and Gould, December,* 1859.)

In the latter case, Judge CLERKE delivering the opinion of the court, says: "The principal if not the sole ground upon which this application rests, is that at the time of the settlement of the house on Mrs. Gould, it was intended by all the parties to that act to secure it in her name for

the occupation of the plaintiff and his family, in such a manner that he could not be deprived of it during his life by any act of Mrs. Gould; and that she could not dispose of it or alienate it in any way during coverture.' If this was the intention, the person establishing it and interested in it, failed in a very marked manner to provide or afford any evidence of it. * * * There is no evidence whatever that any interest, express or implied, legal or equitable, was reserved for the benefit of the plaintiff at the time the assignment was made by the plaintiff's brother to Mr. Du Bois. It would be the merest trifling to attempt to extract any such design from that transaction. The most that could be attempted with any show of plausibility, would be to speculate, from the circumstances, what the parties might possibly have designed; but surely no court of justice will base any action upon surmises so slender and unsatisfactory. The settlement upon Mrs. Gould was complete; the husband was expressly excluded from any interest or interference with it. And this determines the application."

II. "There is no doubt that prior to the acts of 1848 and 1849, for the more effectual protection of the property' of married women, that upon the facts appearing in this' case, Mrs. Gould would have been protected in equity in the enjoyment of this property." (*Per* MASON, *J. in Vandervoort* agt. *Gould, supra; Jaques* agt. *Meth. Epis. Church,* 17 *Johns. R.* 548; *Wadham* agt. *American Home Missionary Society,* 2 *Kern. R.* 424.)

1. She would have been regarded as to this property as a *feme sole,* and have been entitled to enjoy it in her own manner, without the interference, and even against the wishes of her husband, who would have been treated as a stranger. She could have sued him in her own name to prevent his interfering with, and to obtain the possession of this property, and she could have been sued by him.

2. Contracts between husband and wife, although abso-

lutely void at law, were recognized by courts of equity, which protected the wife's separate property, and treated her as a distinct person whenever justice required it. *Courts of equity having created the wife's separate estate, assumed the exclusive protection and control over it.*

3. *Upon this principle,* courts of equity entertained suits brought directly by the wife against the husband, and administered whatever relief the parties were entitled to in conscience.

4. The married woman might sue her husband in equity.

(*a.*) Upon an agreement for a separate maintenance entered into directly with him, without trustees. (*Head* agt. *Head,* 3 *Atk. R.* 295, 547 ; *Guth* agt. *Guth,* 3 *Brown's Ch. R.* 613 ; *Angier* agt. *Angier, Prec. Chan.* 497.) In *Legard* agt. *Johnson* (3 *Ves. Ch. R.* 358), the chancellor declined to interfere solely because the ecclesiastical courts had exclusive cognizance of such cases. This and other decisions of Lord ROSLYN, to the same effect, do not affect the jurisdiction of the courts of this state, where we have no ecclesiastical tribunals. (*Jelinean* agt. *Jelinean,* 2 *Desaus. Ch. R.* 50 ; *Prather* agt. *Prather,* 4 *Id.* 35 ; *Reeve's Domestic Relations,* 214 ; *Story's Eq. Jur.* § 1380 ; *Fireman's Ins. Co.* agt. *Bay and others,* 4 *Barb. R.* 407.)

(*b.*) To compel the specific performance of agreements made between them, without the intervention of a trustee, both before and after marriage. (*Cannel* agt. *Buckle,* 2 *Peere Williams,* 243, 244 ; *Sidney* agt. *Sidney,* 3 *Id.* 264 ; *Wright* agt. *Lord Cadogan,* 2 *Eden's Ch. R.* 253 ; *Atherley Marriage Settlements,* 161 and 125 ; *Cruger* agt. *Cruger,* 5 *Barb. R.* 231 ; *Bradish* agt. *Gibbs et al.* 3 *Johns. Ch. R.* 523 ; *Livingston* agt. *Livingston,* 2 *Johns. Ch. R.* 537.)

(*c.*) To restrain her husband from interfering with her separate estate, and to obtain the control of it. *Martin* agt. *Martin* (1 *Coms. R.* 473), in all its principal features, resembles the case at bar. Mary Martin filed a bill against her husband, and Samuel Richards, her trustee, to restrain

her husband from controlling or interfering with certain real estate alleged to be held in trust for her by Samuel Richards, as her sole and separate property. When the bill was filed the wife was living apart from the husband, having left him in consequence of alleged cruel treatment. He appears to have been living on the farm which constituted her separate property, and the object was to remove him therefrom (*p.* 480). The first question was, whether the land was the separate property of the wife; and the second, whether any transactions subsequent to the creation of the trust gave the husband any equitable rights in the property. The court answered both in the affirmative, and awarded the plaintiff the relief demanded, subject to a lien of the husband upon the land (for money advanced) to the extent of $3,000. (*Same case in Chancery,* 1 *Hoff. Ch. R.* 462.)

In *Strong* agt. *Skinner and others* (4 *Barb. R.* 546), an *ante-nuptial* agreement between husband and wife, without the intervention of trustees, whereby each agreed that their separate respective property should remain separate, notwithstanding the coverture, was attacked. The court at general term sustained the agreement, and held: "By virtue of this agreement, Nancy Skinner, after her marriage with R. Skinner, was absolutely a *feme sole* with respect to her separate property, and she retained all the power over it which she could have exercised as a *feme sole* if her marriage had never taken place. She could, with her separate property, have purchased even from her husband any portion of his property, provided the purchase was *bona fide,* and for a valuable consideration; and she could have held it as a part of her separate estate against his prior as well as subsequent creditors; she, with respect to her separate estate was a *feme sole,* as well in her dealings with her husband as with the rest of the world; she could have purchased from him or sold to him as a *feme sole;* she could have borrowed money from him on the credit of her

separate estate, and have charged such estate with its repayment in equity" (*Gardner* agt. *Gardner,* 22 *Wend.* 529). "She could have sued or been sued by her husband, or have become a substantial party against, or at the suit of others" (20 *Wend. R.* 573).

In *Dyett* agt. *N. A. Coal Co.* (20 *Wend. R.* 573), it was held by Mr. Justice COWEN, that "it follows according to the same case (*Jaques* agt. *Meth. Epis. Church*), that she may deal with her husband by granting the estate to him, or by appropriating the estate or its income to his benefit. She may, therefore, sue or be sued by her husband, or become a substantial party against, or at the suit of others." (*See above case in* 7 *Paige's Ch. R.* 1.)

*Holmes* agt. *Holmes* (4 *Barb. R.* 296), was a bill filed by a wife against her husband, to restrain him from receiving and appropriating a legacy bequeathed to her, after she had obtained a decree against him for a separation *a mensa et thoro.* The court granted the relief demanded.

(*d.*) To set aside conveyances of the wife to the husband, made in ignorance of her rights (*Fry* agt. *Fry,* 7 *Paige's Ch. R.* 633).

(*e.*) To obtain an equitable allowance out of that part of the husband's property which was derived through the wife. (*Carter* agt. *Carter,* 1 *Paige's Ch. R.* 463; *Partridge* agt. *Havens,* 10 *Id.* 625; *Van Duzer* agt. *Van Duzer,* 6 *Id.* 366; 2 *Story's Eq. Jur.* §§ 1404, 1414; *Clancy on Married Women, p.* 464; *Roberts* agt. *Roberts,* 2 *Cox's Ch. R.* 421; *Ellis* agt. *Ellis, there cited* ; *Kenny* agt. *Udall and Kenny,* 5 *Johns. Ch.* 463; 3 *Cow. R.* 590.)

(*f.*) To charge the separate estate of the wife with money borrowed from the husband (*Gardner* agt. *Gardner,* 22 *Wend. R.* 529).

III. These rights and remedies are all confirmed and increased by the acts of 1848, 1849 and 1860, "for the more effectual protection of the property of married women." Married women may now sue their husbands

and others, and be sued by them as to their separate property, at law as well as in equity, for any redress, exactly as if they were unmarried. (*Acts of* 1848 *and* 1849, 3 *R. S. p.* 239, *5th ed.* ; *Laws of* 1860, *p.* 157; *Code,* § 114; *Power* agt. *Power,* 23 *N. Y. R.* 528.)

The second section of the act of 1849, authorizes the trustees of the separate property of married women, upon the written request of the married woman, accompanied by the certificate of a justice of the supreme court, to transfer such separate property to such married woman, to her sole and separate use (2 *R. S. p.* 331, § 68, *4th ed*). Trustees of the separate property of married women have always been under the especial protection of all courts. They might sue in law or in equity to protect the trust property. They might bring actions of ejectment or trespass. In some cases they might be compelled to defend their titles at law or equity. (*Hill on Trustees,* 3*d Amer. ed. p.* 403, *and note* 1, *and cases cited* ; *Cruise on Real Property, title* 12, *chap.* 4, § 4, *ed. of* 1823.) And they were always entitled to the advice and directions of courts of equity. Now is it possible to suppose that the legislature intended to transfer these trust estates from trustees who had full power to protect them, to the married woman, unless the married woman had the same powers? And that too, in an act for the more effectual protection of the property of married women. The right to sue at law is a necessary incident to the absolute right of property, and the legislature having given this, the right to sue at law followed (*Fettiplace* agt. *George,* 1 *Vesey Jr.* 40).

1. The right to sue and be sued in any court, was not given *in terms* by the acts of 1848 and 1849. Notwithstanding this, the right of the wife to sue the husband to the extent previously allowed, was necessarily implied from the rights of property conferred by these acts, on the principle that *ubi jus, ibi remedium* ; and also followed as an incident to the separate property, within the rule enunci-

ated in *Yale* agt. *Dederer* (18 *N. Y. R.* 272); *Devin* agt. *Devin* (17 *How. Pr. R.* 514). Otherwise, the wife would have a barren right, without the means of enforcing it.

2. In 1860, however, the legislature declared that " any married woman may, while married, sue and be sued in all matters having relation to her property, which may be her sole and separate property, or which may hereafter come to her by descent, devise, bequest or the gift of any person except her husband, in the same manner as if she were sole" (*Laws* 1860, *p.* 157, § 7). It was intended by this section to give married women some remedy which they did not before enjoy. Courts of equity had always been open to them. Unless, therefore, this section opened the courts of law to them, no meaning or effect can be given to it.

The married woman may sue as if she were sole under this act. A *feme sole* may sue at law or in equity; therefore, a *feme covert* may do the same. A *feme sole* may make " any person a defendant " who has " interest adverse to her" (*Code*, § 118); therefore, a *feme covert* may do the same. The only limitation to a married woman's right to sue under the act of 1860, is when her separate property is derived by gift from her husband. And *expressio unius est exclusio alterius*. This does not except any person from being made defendant at her suit, nor any forum from hearing her cause, but only excepts one species of property from responding to her demands. The broad right to sue as a *feme sole* being given, it is unnecessary for the legislature to authorize the wife in terms to sue her husband at law. " Can any one say that by such an omission the king's subjects should lose the benefits of the king's courts, which are part of the constitution of the government, and part of every man's birthright to sue and be sued in." (HOLT, *Ch. J. in Crosse* agt. *Smith*, 12 *Mod. R.* 643.) Statutes are to be read according to their natural meaning, and when clear and precise need

no interpretation. Subtle construction is not favored. Courts cannot correct excess of legislation, but must give full effect to the natural meaning of the words used. (*Waller* agt. *Harris*, 20 *Wend. R.* 562; *Jackson* agt. *Lewis*, 17 *Johns. R.* 477; *People* agt. *N. Y. Central R. R.* 13 *N. Y. R.* 80.)

3. The court of common pleas has held that a common law execution may issue against the separate estate of a married woman, because the laws of 1848 and 1849 allow her to hold separate property as if she were a *feme sole* (*Sexton* agt. *Fleet*, 2 *Hilton's R.* 483, opinion of BRADY, J). Upon this point Judge BRADY says, in *Walker* agt. *Swayzee* (3 *Abb. Pr. R.* 136): "The statutes of 1848 and 1849, removed many if not all of the legal disabilities of coverture to the possession and enjoyment by the wife of a separate estate; and having conferred upon married women the power to hold real· or personal estate, as if unmarried, established and subjected her to all the rights, obligations and liabilities incidental to such possession. In reference to that separate estate, as we have seen, she may sue and be sued alone. Her husband is a stranger to it. * * * His wife as to that estate has a separate legal identity, which was unknown to the common law and in equity, and must submit to the usual decrees of courts of justice for her acts affecting her separate estate so held and enjoyed. If courts of equity still existed, their interposition would be unnecessary. The execution to be issued on the judgment rendered against her would reach her personal or real estate, and the appropriation of it in the usual form of proceeding against judgment debtors, would satisfy the ends of justice."

The same argument which led to this conclusion, establishes Mrs. Gould's right to maintain this action. The disability to be sued at law being removed, the disability to sue at law is also removed. The habit indulged in by courts of law, of not following their arguments to their

conclusion, has led to the reproach that "the timidity of courts of law, and prejudices incident to technical learning, have given existence to more than one-half of the cases to be found in our chancery reports" (*Reeve's Domestic Relations*, 214).

4. This is an "act for the more effectual protection of the property of married women." Its object, as shown by its title, was not so much to give new rights to married women as to protect old ones more effectually. That is, to give new remedies. The only new remedies that could be given were at law, for they already enjoyed all the remedies known to equity. The title of the act is the key to the intention of the framers (*Jackson* agt. *Gilchrist*, 15 *Johns. R.* 116).

5. The numerous cases in which these married women's acts have been strictly construed, are all cases in which new rights of property, in derogation of the common law are claimed, not where new remedies are asserted. So far as these acts provide new remedies only, they have been liberally construed. (*Darby* agt. *Callaghan*, 16 *N. Y. R.* 79; *Billings* agt. *Baker*, 28 *Barb. R.* 346, 351 and 356.) In *Power* agt. *Power* (17 *How. Pr. R.* 413), the wife was allowed to foreclose a mortgage against her husband which had been executed by him to her in 1851, before their marriage. In *Devin* agt. *Devin & McKelvey* (17 *How. Pr. R.* 514), the wife's suit to recover from her husband and his partner, her personal property, loaned to carry on the business of the firm, was allowed. Judge INGRAHAM said: "Nor am I prepared to hold that a loan of money made by a wife under such circumstances, to a firm, of which her husband is one of the partners, cannot be recovered, because they can make no contract. On the contrary, I think such a contract can be made, and if made, can be enforced at any rate in an equitable proceeding, if not at law."

In *Power* agt. *Power* (23 *N. Y. R.* 530), JAMES, J., deliver-

Gould agt. Gould.

ing the opinion of the court of appeals, said : "Modern legislation has declared the married woman to have a separate legal existence, and separate rights of action." These statutes are inconsistent with the common law, and as both cannot stand, the latter must yield. The reason for the common law rule, viz. : the unity of persons which disabled the wife from suing the husband, has also been repealed (*Code*, § 114). The wife has been admitted to separate rights of action, as .well as of property. Now a wife may maintain an action in her own name concerning her separate estate, against her husband or any other person. And the action alluded to is an ordinary proceeding in a court of justice for the redress or prevention of a wrong, or the enforcement or protection of a right (*Code*, § 2). The objection, that if the legislature had intended to allow a wife to sue her husband at law, they would have declared so in terms, has little weight. Such an objection is of no force when applied to limit the effect of a remedial law, which must be construed liberally (*Billings* agt. *Baker*, 28 *Barb. R.* 376). It is feeble at all times, for the legislature never attempts to define all the cases to which a general law shall apply. But the objection loses all its force when we reflect.

6. The reasons that courts of equity were formerly open to married women, while courts of law were closed against them, have ceased. SELDEN, J., in delivering the opinion of the court of appeals in *Yale* agt. *Dederer* (22 *N. Y. R.* 460), says on this subject : "Married women are not hereafter to be indebted to equity merely, for protection in the enjoyment of their separate estates. They hold them by a legal title, and have a legal right to dispose of them. The acts of 1849 and 1860, are henceforth, if not repealed, to be the source of their power over such estates. There is no longer any foundation for the argument that as equity creates and protects these estates, equity has a right to control them. Rules which have grown up under this idea,

which I regard as to some extent illusory, will be hereafter entirely inappropriate." (*Cessante ratione cessat ipsa lex.*)

7. All argument against these views, based upon the unity of interests and persons, of affection and confidence in the marriage relation, is out of place under the acts of 1848, 1849 and 1860, and can only be addressed with propriety to the legislature. Husband and wife are strangers to each other as to their separate property. The husband cannot even protect the wife's person or character by suit (*Laws* 1860, § 7).

8. Before these acts Mrs. Gould had only an equitable estate in this property. She has now a legal estate in it (*Vandevoort* agt. *Gould, supra*). The rule that real estate held at law could not be recovered in equity, was just as strict as that equitable relief could not be granted at law. If the plaintiff had gone into equity, it would have been objected that her estate being legal her remedy was at law.

IV. The distinction between, and forms of actions at law and suits in equity are abolished, and but one form of action is recognized (*Preamble to Code, and* § 69).

1. The action of "ejectment" is not known as such, but is designated "an action for the recovery of specific real property" (*Code*, § 253).

2. The defendant might have set forth in his answer to the complaint as many defences and counter-claims as he had, whether such as have been heretofore denominated legal or equitable, or both. (*Code*, § 150 ; *Crary* agt. *Goodman*, 12 *N. Y. R.* 266 ; *Dobson* agt. *Pearce, Id.* 156. He cannot, therefore, complain that there might be equities in his favor which could not be protected in this action. If he has not set them up he has no one but himself to blame.

V. The learned court erred in dismissing the complaint in this action. It should have granted the plaintiff "any relief consistent with the case, made and embraced within the issue." The powers of the former courts of law and equity are now blended in one court. And whenever the

defendant has put in an answer, the court is bound to grant the plaintiff whatever relief he sho⌄⌐s himself entitled to, although it be radically different from that demanded in the complaint, without any regard to the distinctions between legal and equitable relief, or to the theory upon which the complaint is framed, even though it contains no prayer for general relief. (*Code*, § 275; *Marquat* agt. *Marquat*, 12 *N. Y. R.* 341; *Emery* agt. *Pease*, 20 *N. Y. R.* 63; *The N. Y. Ice Co.* agt. *Northwestern Ins. Co.* 23 *N. Y. R.* 359; *Barlow* agt. *Scott*, 24 *N. Y. R.* 45; *Phillips* agt. *Gorham*, 17 *N. Y. R.* 270; *Crary* agt. *Goodman*, 12 *N. Y. R.* 266; *Dobson* agt. *Pearce*, *Id.* 165; *Wright* agt. *Hooker*, 10 *N. Y. R.* [6 *Seld.*] 51; *Dunnell* agt. *Keteltas*, 16 *Abb. Pr. R.*; 2 *Tillinghast & Sherman's Practice, Title Relief to Plaintiff after Answer*; *Monthly Law Reporter for September*, 1863, *p.* 625; *See* agt. *Partridge*, 2 *Duer's R.* 463; *N. Y. Transcript*, *January 16th and February 14th*, 1863.)

1. When the defendant has answered, " the demand of relief in the complaint becomes immaterial. The case made by the complaint and the limits of the issue alone determine the extent of the power of the court." (*By* JOHNSON, *J. Marquat* agt. *Marquat*, *supra*).

2. " The question in an action is not whether the plaintiff has a legal right or an equitable right, or the defendant a legal or an equitable defence against the plaintiff's claim; but whether, according to the whole law of the land applicable to the case, the plaintiff makes out the right which he seeks to establish, or the defendant shows that the plaintiff ought not to have the relief sought for (*Crary* agt. *Goodman*, *supra*).

3. The prayer for relief being immaterial, the court must grant whatever remedy the plaintiff shows himself entitled to, whether he has demanded it or not. In *Marquat* agt. *Marquat* (*supra*), the demand was for equitable relief only (specific performance); the cause was tried at the special term, and the court awarded legal relief only (damages).

In *Emery* agt. *Pease* (*supra*), the demand was for legal relief only (money due on contract) ; the action was tried at the circuit, and the court ordered equitable relief only (an accounting), holding that " if the case which the plaintiff states entitles him to any remedy, either legal or equitable, his complaint is not to be dismissed because he has prayed for a judgment to which he is not entitled " (20 *N. Y. R.* 64). In *N. Y. Ice Co.* agt. *Northwestern Ins. Co.* (*supra*), the case, although demanding legal and equitable relief, was tried at special term as an equity case, and the court held that legal relief (damages) should have been awarded. In *Barlow* agt. *Scott* (*supra*), the complaint asked for specific performance or damages ; it was tried at special term as an equity case, and damages were held to have been properly awarded.

4. The idea that a complaint must be framed with a double or alternative demand for relief, to entitle the plaintiff to either legal or equitable redress, is entirely negatived by *Emery* agt. *Pease*, and *Marquat* agt. *Marquat.*

5. The objection that suitors have a right to have certain issues of fact tried by a jury, and issues of law tried by the court, will, if taken in time, always prevent a trial by the wrong tribunal.　But it will never be a reason for dismissing the complaint. (*Code*, §§ 253, 254 ; *Barlow* agt. *Scott*, *supra* ; *Greason* agt. *Keteltas*, 17 *N. Y. R.* 491 ; *Emery* agt. *Pease*, 20 *N. Y. R.* 64, *and cases supra.*) If the court had been of opinion (on objection taken) that this action was not one for a jury, it could have—

(*a*.) Proceeded with the trial as a court, dismissing the jury or not, at its discretion, as was done in *Emery* agt. *Pease*.　Or,

(*b*.) Sent the action to another branch of the court for trial.　In *N. Y. Ice Co.* agt. *Northwestern Ins. Co.* (*supra*), Judge INGRAHAM thought he had no power to do this, but the court of appeals overruled him (*Stevenson* agt. *Buxton*, 15 *Abb.* 352). Or,

(*c.*) Having postponed the trial in case of inequitable surprise to the defendant, as the judge offered to do in *See* agt. *Partridge* (2 *Duer*, 468). In either case it is a mere matter of convenience in judicial procedure, and as such within the discretion of the court.

VI. Mrs. Gould lost no rights of property by leaving her husband. (*Vandevoort* agt. *Gould, supra; Martin* agt. *Martin*, 1 *Coms. R.* 473.)

1. Her withdrawal from her husband's domicil is not necessarily unlawful or reprehensible. It may be her duty to do so, or at least her right (2 *R. S.* 329, § 54, 4*th ed*).

2. The fact that both the children, one being of full age, and the other aged eighteen, left their father and accompanied their mother to Europe, is impressive evidence against him.

VII. The objection that Mr. Gould was trustee for his wife, and that, therefore, this action cannot be maintained, is without weight.

1. Courts of equity invented the fiction of considering the husband a trustee for the wife, when no trustee was named in the deed of settlement, solely for the wife's protection, and to avoid the marital rights of the husband. (2 *Bright's Husband and Wife*, 214; 2 *Story's Eq. Jur.* § 1380.) Thus in *Bennet* agt. *Davis* (2 *Peere Wms. R.* 316), this fiction saved the wife's estate from the husband's assignee. In *Parker* agt. *Brooke* (9 *Ves. Ch. R.* 583), it protected the wife's estate against a purchaser from her husband with notice.

2. Where the interests of husband and wife are opposed, he will never be considered her trustee, but if a trustee is necessary, the court will throw it upon those whose interests are the same as the wife's. (*Davidson* agt. *Atkinson*, 5 *Term R.* 434; *Bright, supra*.)

VIII. The judgment should be reversed and a new trial ordered, with costs to the appellant.

A. J. Vanderpoel, *for the respondent.*

I. At common law this action could not have been maintained.

II. The acts of 1860 and 1862, have not so far altered the relation of husband and wife as to enable her to maintain an action at law for any cause against him (*Longendyke* agt. *Longendyke, Albany Gen. Term, September,* 1863).

1. The idea that a wife could maintain an action of ejectment to turn her husband out of doors, was quite as foreign to the intent of the legislature, as that she could maintain against him an action for an assault and battery.

2. The legislature have not entirely destroyed the "unity or identity between husband and wife."

3. Notwithstanding the general words of the acts of 1848 and 1849, the wife cannot convey lands directly to her husband, nor can the husband take any estate by a direct conveyance from the wife. (*White* agt. *Wager,* 25 *N. Y. R.* 328; *Vorheis* agt. *Presbyterian Church,* 17 *Barb.* 103.)

4. The legislature have not said that a husband may be sued in an action at law by his wife; nor interfered with the rule that his residence is her residence; nor enabled her to turn him out of doors when caprice might dictate, under an execution issued upon a judgment in an action of ejectment.

5. In the absence of a trustee, the defendant was trustee of the separate estate of his wife, and entitled to manage it. The plaintiff and defendant were married in 1833, and the conveyance from Cornelius Du Bois to Mrs. Gould was in 1842. (2 *Story's Eq.* § 1380; 1 *Roper,* 151; *Yale* agt. *Dederer,* 18 *N. Y. R.* 265; *Westervelt* agt. *Gregg,* 2 *Kern.* 202.)

6. She could not acquire a separate domicil from his; his must be hers until the relation between them as husband and wife is dissolved or qualified by a judicial decree.

Even his consent that she should live separate from him, would not authorize her to acquire a new domicil. (*Story's Con. of Laws*, § 46; *Burnham* agt. *Rangeley*, 1 *Wood & M.* p. 11; *Dolphin* agt. *Robbins*, 5 *H. of L. Cases*, 390.)

7. A court of equity under a complaint properly framed, can adjust the difficulties between husband and wife (*Reubens* agt. *Joel*, 3 *Kern.* 488).

III. The inchoate agreement for a future separation was properly excluded. It was void.

1. It provided for a future separation.

2. If ever of any validity or effect, it was revoked by continuing cohabitation after it was made, and also after the period (May 1st) fixed for the separation. (*Sugden on Prop. in H. of L.* 177-8; *Hindley* agt. *Westmeath*, 6 *B. & C.* 200; *Bateman* agt. *Lordy*, 1 *Ross & Dow.* 235; *H—* agt. *W—*, 3 *Kay & Johns.* 382; *Van Sittart* agt. *Van Sittart*, 22 *Lond. Jur.* 520, *per Lord Chancellor.*)

IV. The judgment dismissing the complaint should be affirmed.

By the court, BRADY, J. On the 1st March, 1855, the parties hereto ratified in writing the result of the negotiations of referees selected to accomplish an amicable separation between them. They were then living together in the house to recover the possession of which this action is brought, and they continued to live there together until the 28th July, 1855, when, or about which time, Mrs. Gould went to Europe. The referees determined, among other things, that the parties should live separately, and retire from each other, from and after the 1st May, 1855, and this was ratified in the manner stated. It was not carried out, however, according to the provisions of the agreement of the parties, they having lived together until July following, as already stated. What reasons led to this agreement was not shown upon the trial; whether it was necessary in consequence of the misconduct of either or

both, or whether it arose from an incompatibility of temper, or was for the gratification of a mere whim by either or both, does not appear. The instrument, however, no matter what the inducing cause may have been, did not contemplate an immediate separation, and was void as against the policy of the law, (*Hindley* agt. *Marquis of Westmeath*, 6 *B. & C.* 200 ; *H.* agt. *W.* 3 *Kay & Johns.* 382 ; *Durant* agt. *Tiltey*, 7 *Price*, 577 ; *Carson* agt. *Murray*, 3 *Paige*, 483, *and briefs; Rogers* agt. *Rogers*, 4 *Paige*, 516 ; *Florentine* agt. *Wilson*, *Hill & Denio's Sup.* 303 ;) assuming it to possess the necessary auxiliary of a trustee, which it does not, and which affects its validity. (*Cases supra.*)

As an agreement for a future separation, it was not carried out according to its terms, the parties having lived together for nearly three months after the day agreed upon to separate, and it may . be well questioned, whether, assuming the agreement to have been valid, it was not rescinded by the subsequent cohabitation or living together (*Carson* agt. *Murray, supra, Chancellor's opinion*, *p.* 501). This case must therefore be regarded as an action of ejectment brought by a wife against her husband, from whom she has voluntarily separated, and the right to maintain it . depends entirely upon the enabling statutes of 1848, 1849, 1860 and 1862. I have had occasion in several cases determined at the special and general terms of this court, to express my opinion upon the object and intent of these statutes, and there can be no doubt that the legal status of a married woman created by them is entirely different from that accorded her by the common law. The literal construction of the act of 1862, would authorize any proceeding by a wife against her husband that she could initiate against any other person, and it may be that it was the intention of the legislature to grant to her the right suggested. She is authorized by section 2 of the act of 1860, to carry on any trade or business, and perform any labor or services on her sole and separate account and her earn-

ings are secured to her as her sole and separate property.

It may be that the legislature intended by the act referred to, to authorize a married woman to abandon her husband, neglect her children, and in disobedience to her husband, engage in any pursuit in which she chose to invest her separate estate, or risk her credit. A literal reading of the statute would lead to no other conclusion, and if such was the intention of the legislature, it has inaugurated an element which strikes at the very foundation of conjugal happiness, and which must ultimately produce great mischief. I do not believe the legislature designed to establish any such authority. The act of 1860 went still further. It made every married woman the joint guardian of her children with her husband, with equal powers, rights and duties in regard to them. The act of 1862 repealed the provision just recited, and several provisions also of the act of 1860, the object of which was to enable a woman who could not obtain the assent of her husband to the sale of her property, to procure the power to do so on application to the county court. The legislation on the subject of married women, has been, therefore, unsatisfactory and wavering. The effect upon marital happiness has been doubted or ascertained, and as each one of the influences has operated upon the legislators, they have enacted, repealed, amended or modified existing laws. There is nothing in any of the acts mentioned, which shows an intention on the part of the legislature so to invade the existing legal relation of husband and wife, as to authorize the latter to commence an action of this character against her husband ; an action in form, and by proof on the trial, presenting no other feature than a title to the premises.

The legislature did not intend by the acts referred to, to make a husband in the language of LAWRENCE, J., tenant at will to the wife, of his marital rights (*Chambers* agt. *Canfield*, 6 *East*, 244). The object of these statutes was to afford ample protection to the wife against the improvi-

dence of her husband, by securing to her all her separate estate, free and clear of his debts, and to enable her with his consent, or upon his abandonment of her, to carry on business on her separate account. The design was not to release her from all her marital obligations, and make her entirely independent of her husband, sweeping away the right of the husband to any control over her, and all his rights, acknowledged for hundreds of years, by a series of legal decisions. It was no more intended by the legislature that she could eject her husband from her house, than that she could maintain an action of assault and battery against him, although by the literal reading of the statute of 1863, section 7, that right of action is granted (*Longendyke* agt. *Longendyke, Albany Gen. Term, September,* 1863).

When a wife having a separate estate, of which she is unjustly deprived by her husband, wholly or partially shall establish by proper proofs her right to its absolute possession, then she must be protected by the law, and her property restored. When she becomes an actor, it must be upon proper allegations and proof, and not upon the mere abstract doctrine of title.

If upon the trial of this action, although in form as already suggested resting upon title, the plaintiff had offered to prove such facts as would entitle her to the possession of her property, I thing she might have proceeded with her action regardless of its form. She did not offer to do so, and the case made out is one which cannot be sustained at law, and to which on the facts proved the rules of equity do not apply.

She is not entitled, therefore, to the relief demanded, upon the whole law of the land.

DALY, F. J., *dissenting.* It has already been held in two actions in the supreme court—*Gould* agt. *Vandervoort & Gould* (*December Gen. Term,* 1859), and *Vandervoort* agt. *Gould* (*February Gen. Term,* 1862), that the premises, the possession of which the plaintiff sought to recover by this

action, are her separate property, and that her husband has no legal or equitable title therein. That point, therefore, may be assumed upon the facts of this case, and upon the respect which is due to these decisions, and the only question presented for our consideration is whether a married woman, who is living apart from her husband, can against him maintain an action in the nature of an action of ejectment, to recover certain leasehold premises which are her separate property, and of which he holds the possession.

The rule of the common law established at least as early as the fifteenth century, and probably long before it, is in the language of *Littleton Inst.*, 68, " that the husband and the wife are in law but one person;" and as Sir WILLIAM BLACKSTONE interprets it (1 *Com.* 441), " the very being or legal existence of the woman is suspended during marriage, or at least is incorporated and consolidated with that of the husband." It follows that if they are in the eyes of the law but one person, that one cannot bring an action against the other, and in *Marshall* agt. *Sutton* (8 *T. R.* 545), the rule of the common law was applied, even where by a mutual arrangement between them, the wife was living apart from the husband upon a separate maintenance. Lord KENYON, in that case, after referring to the rule that man and wife are in law but one person, said : " This difficulty meets the plaintiff *in limine*. If it did not, and the parties were competent to contract at all, it would then become material to consider how far a compact could be valid which has for its object the contravention of the general policy of the law in settling the relations of domestic life, and which the public is interested to preserve, and which, without dissolving the bond of marriage, would place the parties in some respects in the condition of being single, and leave them in others subject to the consequences of being married, and without which, would introduce all the confusion and inconvenience which must necessarily result from so anomalous and mixed a character;" and after

remarking, that it cannot be in the power of persons by
their private agreement to alter the character or condition
which by law results from the state of marriage while it
subsists, and from thence to infer rights of action and legal
responsibilities, as consequences following from such alter-
ation of condition and character, he declares that no power
other than that of the legislature, can change that which by
the common law of the land is established as the course of
judicial proceedings.    It followed as the logical result of
this rule of the union of persons, that the wife if injured
in her person or property, could bring no action without
the concurrence of her husband, and it had to be brought
in his name as well as her own.    (*Russell* agt. *Lord*, 1 *Salk.*
119; 1 *Roll. Abr.* 347; 1 *Black. Com.* 443.)    And this
unity of person brought with it many other disabilities,
and a unity of interests and of rights in respect to both
real and personal property, which were gradually adjusted
and settled by a long course of adjudication.

Of the rule itself, but little at the present day can be
said in its favor, except that it has been long settled and
steadfastly adhered to.    It did not exist in the enlightened
system of Roman jurisprudence, from which the common
law has derived the most durable as well as the most valu-
able of its rules and maxims, nor has it ever prevailed in
other countries, where the law as a science has been studied
as profoundly, and interpreted as comprehensively as by the
jurists of England.    In all these countries the husband
and wife are considered as two distinct persons, and may
have separate estates, contracts, debts and injuries, and
may also by agreement with each other have a community
of interest; nor has this mode of considering them "intro-
duced the inconvenience and confusion," which Lord Ken-
yon, in the case above cited, thought "must necessarily
result from so anomalous and mixed a character" as that
of regarding them in some respects as in "the condition
of being single, and in others subject to the disability of

being married." Courts are naturally, and perhaps wisely, apprehensive of the consequences of disturbing long settled rules, as it is not possible in all cases to forsee the effects that may follow, and this consideration is very apt, as in the case of Lord KENYON, to beget a respect for the rule itself which it does not intrinsically deserve.

*Dr. Hartley*, a metaphysician of the last century, who wrote a book of some reputation entitled " *Observations upon Man*," supports the maxim of the English law that man and wife are to be regarded as but one person, by the broad declaration that the authority of the man over the wife is but a mark of our degenerate state, by reason of which dominion must be placed somewhere, and therefore in the man; and what the nature of it was under the common law may be told in the language of *Mr. Macqueen*: " The wife was precluded from the enjoyment of property, for whatever belonged to her while single, or came to her while covert, passed absolutely to the husband, or fell under his dominion. In vulgar phrase, what was hers became his, and what was his remained his own; she could possess nothing to her separate use; she could alienate nothing in her life time; she could bequeath nothing by her death " (*Macqueen on Husband and Wife*, 283). And *Blackstone* tells us that the husband might " give his wife moderate correction, for as he is to answer for her misbehavior, the law thought it reasonable to entrust him with this power of restraining her by domestic chastisement, in the same moderation that a man is allowed to correct his apprentices and children." He says, however, that in the politer reign of Charles, II, this power of correction began to be doubted, but that in his (*Blackstone's*) time, the lower ranks of people, from their affection for the old common law, still claimed and exerted their ancient privilege (1 *Black. Com.* 444).

The passages above quoted, indicate better than anything else, how little the policy of the English law respecting

women is in consonance with the present views of society, or with the usages and laws of other countries. When Henry the First, in the twelfth century, by his courtesy, as the *Mirror of Justice* expressed it (§ 3), declared that all husbands who survived their wives, who were with child by them, should hold their wives' inheritance forever, it was followed by the general suppression of the more liberal laws and customs respecting women, that prevailed among the Saxons, and by the institution of usages and laws conformable to the peculiar policy of the feudal system, a system which was simply, to use the expressive language of *Mr. Jeremy*, in his work upon *Equity Jurisdiction*, " a scheme of plunder and oppression." It was when this scheme was in its full perfection, that the maxim, that man and wife as respects their civil rights, are to be regarded but as one person, was conceived and laid down as a rule by which courts were to be governed, and however possible it may have been in the very unnatural state of society to adhere to it as a principle of law, it was not possible to do so as society improved, and hence at an early period, to prevent oppression and wrong, it became necessary that the court of chancery should assume a jurisdiction in respect to married women and their rights, directly in conflict with the maxim of the feudal law. The chancellors professed to recognize it as the settled law of the land, but rested their jurisdiction upon the ground that there were cases to which it ought not to be applied. " When the general maxims of the law," says the writer of that early work, the *Doctor and Student*, " be in any particular cases against the law of reason, it must be reformed by conscience ; that is to say, by the law of reason " (*Chap.* 16) ; and as as this power of reforming by conscience was lodged in the court of chancery, that court, though proceeding very cautiously at first, began gradually to exercise it largely for the protection of the rights of married women.

In the reign of Queen Elizabeth, Mary Larky, who was

living apart from her husband, brought her suit in the court of chancery to compel the defendant to apply moneys in his hands to her maintenance, which were derived from the sale of her inheritance, and the defendant relying upon the maxim of the common law, demurred, upon the ground that she could not sue him without her husband, but the chancellor, Sir THOMAS BROMLEY, overruled the demurrer, and compelled the defendant to answer (*Cary's Reports*, 124). And under Sir WILLIAM HATTON, the court a few years after went a step further in disregard of the common law rule, and held that in that court a wife might sue her husband (*Rivet* agt. *Lancaster, Tothill's Rep.* 93), and though still regarding the rule of the common law as one to be enforced in proper cases, the courts of equity from thenceforward have, for all essential purposes, regarded the husband and wife as the civil law treats them, as distinct persons, capable, to use the language of *Story*, "in a limited sense of contracting with each other, of suing each other, and of having separate estates, debts and interests" (*Story's Eq. Juris.* § 1368).

I have thus stated the rule, its history, and the reasons that have been assigned for it, that we may be the better enabled to judge whether the legislature intended or not, to change it, when they enacted "that any married woman may while married, sue and be sued in all matters having relation to her property which may be her sole and separate property, or which may hereafter come to her by descent, devise, bequest, or the gift of any person except her husband, in the same manner as if she were sole" (*Laws of N. Y.* 1860, *p.* 158, § 7). The language of the legislature is certainly broad enough to have that effect, and such would necessarily be the effect of it, unless it is manifest from other considerations that such could not have been the intention of the legislature. It is very clear that this enactment has swept away one incident of the doctrine of the unity of person, that is that a wife could not sue except

in equity, unless with the concurrence of her husband, and by his being joined with her. It certainly allows her to sue others, and permits others to sue her in any matter having relation to her separate property, in the same manner as if she were a single woman, and if the general words that she may sue or be sued in all matters relating to her separate property, are not to be understood as conferring a right to sue her husband in a matter relating to her property, the reason must be sought in some other part of the act, or in the previous legislation, or in some fundamental principle of right and justice, which we must suppose that the legislature did not intend to disregard. With the view of ascertaining whether there are any such reasons, it may be well to consider what was the state of the law before the passage of the statutes of 1848, 1849, 1853 and 1860, and to what extent these statutes have altered it. As the law stood before their enactment, the personal property of a woman passed absolutely to her husband upon her marriage, nor could she by her own labor or service acquire any during its continuance, unless an express agreement was entered into with her husband before marriage, or after, by the interposition of trustees, authorizing her to carry on trade or business on her own account. Her husband was entitled to the rents and profits of her real estate, and after her death he had in it, if there were issue of the marriage, a life estate as tenant by the curtesy. The only way in which this effect could be avoided was by an ante-nuptial settlement, or by a gift, bequest or settlement of property to her separate use, which a court of equity could enforce as a trust; she could enter into no covenant or contract, though she could by agreement charge her estate with a debt or obligation which a court of equity would enforce, or an intention to charge it would be implied, where the consideration received was for the benefit of the estate.

As respects her separate estate when secured to her by

a settlement, she was regarded in equity as a "*feme sole*," as well in her dealings with her husband as with other persons; she might sue or be sued by her husband, and might with her own money purchase a judgment against him, sell his real estate under an execution upon it, and become the purchaser (*Strong* agt. *Skinner*, 4 *Barb. S. C. R.* 546). And when there was no settlement, and the husband had to get the assistance of a court of equity to obtain property which had accrued to him in right of his wife, or where the wife was living separate from him, and not in a state of adultery, he would be required to make a reasonable settlement out of property derived through her for her maintenance and that of her children. The statutes of 1848, 1849, 1853 and 1860, have made many important changes. They have taken away from the husband any right to the personal property which the wife has at the time of her marriage, or to the rents, issues and profits of her real estate during marriage, and have, by implication, abolished the tenancy by curtesy. They would seem to have abrogated, also, that incident of the doctrine of the unity of the person; that if one was indebted to the other before marriage, the marriage operated to release the debt; and they have limited the liabilty of the husband for the debts of the wife contracted before marriage, to the extent only of the property he may acquire through her; and provided that a judgment obtained upon a debt of that nature shall issue against, and bind her separate estate and property only, and have relieved him from all liability upon contracts made in relation to her separate property, or in carrying on any trade or business. They have allowed her during marriage to take real or personal property, hold it to her sole and separate use; to acquire property by trade, business, labor or service, carried on or performed on her own account, and when so acquired, have secured it to her as her separate property. As respects both her real and personal property, she has the same power over

it, and right of disposition, as if she were unmarried. These statutes have gone very far to sever the interest which the husband had in the property of the wife, both real and personal, but not entirely so, as in the event of the death of either without issue, it is provided that the survivor shall have a life estate in one-third of the real estate of which the other died seized; or if either die intestate, leaving minor children, that the survivor shall take the whole of the real estate of the other during the minority of the youngest child, and afterwards a life estate of one-third in it.

This legislation has almost dispensed with the necessity hereafter of marriage settlements, as it has left nothing to the husband but a contingent and possible interest in one-third of his wife's real estate. It has taken away the necessity of compelling settlements for the maintenance of the wife, founded upon what was termed her equity, as she has now during her marriage the sole right to the use of her property, whether real or personal, and the effect of these changes must be to dispense hereafter with a large portion of that equitable jurisdiction in respect to a married woman's property, or in enforcing what was equitable, where property had been derived through her, which was exercised for her protection and benefit by courts of equity.

"Married women," says SELDEN, J., in *Yale* agt. *Dederer* (22 *N. Y. R.*), "are not hereafter to be indebted to *equity only* for protection in the enjoyment of their separate estates. * * * They hold them by a legal title, and have a legal right to dispose of them. * * * There is no longer any foundation for the argument that as equity creates and protects these estates, equity has a right to control them. Rules which have grown up under this idea, which I regard to some extent illusory, will be hereafter inappropriate." She has no longer occasion for that protection which a court of equity afforded, as the husband is now deprived of that right to, or that control over her

property which he previously possessed, and as where rights which did not before exist are conferred, the remedies which are adequate to maintain and secure them are regarded as conferred also. I can see no reason why a married woman should not have that remedy in a matter relating to her separate property, even as against her husband, which is the best adapted and the most adequate to enable her to enforce her rights. To that remedy she is entitled, and it is altogether immaterial whether it be a legal or an equitable one. Her rights are no longer dependant upon the favor and protection of a court of equity, but are founded upon positive legislation, which has greatly enlarged them, and if a legal remedy is the best adapted to enforce a right conferred upon her by statute, I see no reason why she should not have it even against her husband. We have necessarily retained the distinction between legal and equitable remedies, but have abolished that which existed between legal and equitable tribunals. We are no longer in the anomalous state of having one class of courts in which the rule of the common law that man and wife are but one person, was rigidly administered, and another in which it was disregarded, where the ends of justice required it. We have now but one form of tribunal, and one mode of procedure. The functions of the courts of common law and the court of chancery are now united in the same court, and the distinctions between an action at law and suit in equity no longer exist.

Legal and equitable causes of action may be joined (*Phillips* agt. *Gorham*, 17 *N. Y. R.* 270) by a plaintiff in the same action, or a plaintiff may bring an action seeking a legal remedy, and the defendant may set up an equitable defence, and have affirmative equitable relief (*Crary* agt. *Goodman*, 12 *N. Y. R.* 266). " The question in an action," says Johnson, J., in the case last cited, " is not whether the plaintiff has a legal or an equitable right, or the defendant a legal or an equitable defence against the plaintiff's

claim, but whether according to the whole law of the land applicable to the case the plaintiff makes out the right which he seeks to establish, or the defendant shows that the plaintiff ought not to have the relief sought for;" and their views of the effect which the changes made by the Code have produced, have been reiterated and affirmed in *The N. Y. Ice Co.* agt. *The Northwestern Ins. Co.* (23 *N. Y. R.* 375), and *Barlow* agt. *Scott* (24 *Id.* 40).

Mrs. Gould in the present case does not seek any equitable remedy, and had no occasion to frame her complaint with a view to that peculiar kind of relief. She has been living for the last eight years separate and apart from her husband, under an agreement in writing mutually entered into. The house and lot in Clinton Place, which she seeks to recover in this action, is a leasehold interest, constituting an estate for years, in which her husband has no contingent interest under the act of 1860, as it belongs not to her real but to her personal estate, and would upon her death go, not to her heirs, but to her executors (2 *R. S.* 82, § 6). It is her sole and separate property; she alone is entitled to the benefit and enjoyment of it, and her husband wrongfully withholds the possession of it from her, and enjoys, and has enjoyed whatever benefit has accrued from it while in his possession. She brings the action to recover it, and to recover what he has obtained by the use of it, or compensation for what she has lost by being deprived of it since 1855. Her remedy is, therefore, a legal one. The Code makes provision for an action to recover property like this, with damages for the withholding of it. If the possession and use of the property was withheld from her by any other person than her husband, an action in the nature of the one she has brought would be the proper remedy (*Darby* agt. *Callaghan* (16 *N. Y. R.* 71), and to say that she shall not have such an action against her husband, where he is the wrong doer in keeping her out of the use and enjoyment of her property, would be to allow him to

defeat the object of the statute, and to leave her without remedy. The statute has declared in express words that the property of a married woman "shall not be suject to the interference or control of her husband," and if we deny to Mrs. Gould her right of action, it would be equivalent to saying that it shall be.

The remedy by an action of this kind is a necessary result of the change which the statutes have made. It was not one that was likely to arise in the exercise of equitable jurisdiction anterior to the passage of these statutes, for if there was no settlement, the husband was entitled during marriage to the use and possession of his wife's real estate, and if there was a settlement, a court of equity interposed simply to administer it as a trust. Now, however, when her husband has no control over her property, and the wife is, or need be, no longer in the position of a *cestui que trust*, but holds her property by a legal title, she would have the same legal remedy where her husband interferes with or attempts to control it, that she would have against any other person. No inconvenience was experienced in equity from allowing husbands and wives to bring suits against each other, and none need be apprehended in affording a married woman a legal remedy, when it is the appropriate and the proper one. When the doctrine that a trust might be created in property to the separate use of the wife, was first advanced in the courts of equity, it was strenuously objected to upon the ground that it would have a tendency to create divided interests and hostile feelings in married life, and Lord ALVANLY, when master of the rolls, said in *Lamb* agt. *Milnes* (5 *Vesey, Jr.* 517), that many people disapproved very much of the course of courts of equity in making husband and wife separate persons, yet experience has shown that the apprehensions entertained were wholly groundless, and that this jurisdiction was attended by the most beneficent and salutary result. The act of 1860 also allows married women to

bring actions to recover damages for injuries to their person or character, against any person or body corporate, and declares that the damages when so recovered, shall be their sole and separate property.

It was held in *Longendyke* agt. *Longendyke* (*Albany Gen. Term of Supreme Court, September,* 1863), that this provision could not be regarded as allowing a wife to maintain an action of assault and battery against her husband. Judge HOGEBOOM said, that the right to bring the action might be covered by the literal language of the statute, but he could not suppose that such was the intent of the legislature, as it would be contrary to the policy of the law, and destructive of that conjugal union and tranquility which it has always been the object of the law to guard and protect; and after remarking that the object of these statutes was to add to and distinguish her rights to property as a *feme sole*, and to distinguish her property from her husband, he adds: " the effect of giving so hard a construction to the act of 1860, might be to involve the husband and wife in perpetual controversy and litigation; to sow the seeds of perpetual domestic discord and broil; to produce the most discordant and conflicting interests of property between them, and to offer a bounty or temptation to the wife to seek encroachments upon her husband's property, which would not only be at war with domestic peace, but deprive her probably of those testamentary dispositions in her favor which he might otherwise be likely to make." These are certainly grave considerations, and may be sufficient to justify the court in that case, when the husband and wife were living together when the action was brought, in its conclusion that the statute was not designed to extend to such a case, but they have no application or pertinency in a case like the one before us, when the husband, in direct contravention of the statute, keeps the wife out of the possession and enjoyment of property which belongs exclusively to her, and when there is no means of getting it

away from him and of restoring it to her, except by the assistance of the court.

The statutes which have conferred upon her an absolute and exclusive right to this property, have conferred upon her also the necessary remedy to obtain it ; ·the one she has sought will be attended by no inconvenience arising out of the relation of husband and wife.   It is a very direct and appropriate one under the statutes, which says BROWN, J., in *Darby* agt. *Callaghan* (*supra*) are remedial statutes, and should have a liberal construction.

The nonsuit should be set aside, and a new trial ordered.