Perkins *v.* Perkins.

---

JOHN E. PERKINS, Respondent, *v.* CHRISTINA PERKINS, Appellant.

(GENERAL TERM, THIRD DEPARTMENT, MARCH, 1872.)

Under the existing statutes of this State an action at law cannot be maintained against a married woman by her husband upon a contract to pay him for services rendered to her by him personally. (MILLER, P. J., *contra.*)

The acts conferring additional privileges upon married women, were passed solely to enfranchise married women and to protect their property, and were not intended to confer any additional rights or privileges upon the husband. (P. POTTER, J.)

The nature of the marital relation requires that a contract claimed to have been made between husband and wife to pay for services rendered, should be carefully scrutinized with a view to ascertaining whether the services were not performed voluntarily and as a part of their respective

Perkins *v.* Perkins.

duties to each other, and where the agreement to compensate for services rendered cannot be conclusively shown, or clearly inferred from the facts, no recovery should be allowed. (Per MILLER, P. J.)

APPEAL from a judgment rendered by the County Court of Columbia county, affirming a judgment rendered by a Justice's Court.

The plaintiff, the husband of the defendant, sued to recover for work, labor and services which he claimed to have rendered personally for her, at her request.

It appeared that the plaintiff and defendant were living separately, and that in February, 1859, the defendant had gone to the plaintiff, where he was at work, and induced him to employ himself at a hotel which the defendant owned and kept, in taking general charge of it and of the premises. There was no express agreement as to, payment for, or the value of the plaintiff's services, but by the plaintiff's testimony the understanding was that plaintiff and defendant should keep the hotel for a year, and if they could not succeed, would sell it. The defendant's testimony was substantially to the same purport.

The plaintiff and defendant then lived at the hotel; the former took charge of the bar and premises, cultivated the latter, and gave his attention and services to the business of the establishment in general, and he remained there for some three months, when he left for five weeks, and returned again at the end of the latter period for two weeks, when he was dismissed by the defendant, who rented the place to one Gallagher, her brother-in-law, and thereafter plaintiff and defendant again lived separately.

The defendant conceded the efficiency of the plaintiff's services during three weeks immediately following his taking up his abode at the hotel, but claimed that since that time they had been worthless, on account of plaintiff's intemperance.

*S. L. Magoun,* for the appellant.

*R. E. Andrews,* for the respondent.

Present—MILLER, P. J., P. POTTER and BALCOM, JJ.

P. POTTER, J.   This is an action of law brought by a husband against his wife to recover, in an action of assumpsit, for services claimed to have been performed for the wife.

At common law the husband and wife by marriage became one person.   The very being or legal existence of the woman was, by the common law, suspended during the marriage, or at least was incorporated and consolidated into that of the husband, under whose wing and protection she performed every act.   (1 Black. Com., 442 ; Littleton, §§ 168, 291 ; Bright on Husband and Wife, 2.)   It was in consequence of this unity of person between them that neither the husband nor wife could make a grant or contract, the one with the other, (*Shepard* v. *Shepard*, 7 John. Ch., 60 ; *Voorhees and Wife* v. *Presbyterian Church*, 17 Barb., 104, 105 ; *White* v. *Wager*, 25 N. Y., 329 ; per DENIO, J., McQueen on Husband and Wife, 18.)   By these and numerous other authorities the husband and wife are one person.   In this condition of unity a husband and wife could no more contract with each other than one individual could contract with himself; the act would be a nullity.

Modern statutes in this country, however, have wrought some changes in this relationship.   The incapacity of a wife to make contracts has, to some extent, been removed by these statutes.   Except to the extent that this incapacity has been removed by statute, the marriage relation, in its oneness of unity, remains unchanged, as it was at common law before those statutes were enacted.   The new powers conferred on married women by these statutes were in derogation of common law, and are to be strictly construed.   (Coke's Inst., 97, *b ; Graham* v. *Van Wyck*, 14 Barb., 531, 532 ; 4 Sandf., 236.)   These modern statutes relate only to the control and management by married women of their sole and separate estate.   As to that, the wife is to be deemed a *feme sole*.   The husband has had no new powers conferred upon him, nor has he been released from any of the duties and obligations imposed upon him.   His condition in this marriage relation is unchanged, so far as regards its unity.   The wife is released

from no part of this unity, except in so far as it is expressed in these statutes.

In *White* v. *Wager* (25 N. Y., 333), DENIO, J., speaking of these statutes, says : "No doubt there was an intention to confer on the wife the legal capacity of a *feme sole* in respect to the conveyance of her property, but this does not prove that she can convey to her husband." Then he proceeds to show that as *femes sole* have no husbands, the implication is against the power to convey to a husband.

These statutes, being in derogation of the common law, are to be construed with reference to the common law as it existed when they were passed. DWARRIS says: It is not to be presumed that the legislature intended to make any innovation upon the common law further than the case absolutely required. The *law* rather infers that the act *did not* intend to make any alteration, other than what is specified and *besides* what has been pronounced ; for if they had that design, they would naturally have expressed it. And Chancellor KENT says: This has been the language of courts in every age, repeating the language of DWARRIS, " That it is not to be presumed that the legislature intended to make any innovation upon the common law further than the case absolutely requires." (1 Cow., 464.) The instances are repeated in our books of reports holding this construction to be sound. It would be contrary to the public policy of the law that there should be a divorce from that original union and mutual confidence demanded by the marital relation. There has been no expression, either in the titles or enacting clauses of the statutes for the protection of married women or their property and estates, in their letter or spirit, of an intent to destroy the unity or identity of husband and wife, or which demands or authorizes any such construction as that they may sue or be sued at law, by each other. It would be monstrous, it would open a door to intolerable controversy and litigation, and sow the seeds of perpetual domestic discord and broil. (*Longendyke* v. *Longendyke*, 44 Barb., 369.) It would convert the holy institution and honored relation of marriage into a nursery to culti-

vate the worst passions and infirmities of humanity. Surely no such downward progress was intended by the legislature in this day of advancement in civilization, of our natural progress in knowledge and intelligence, and of our advanced social and political condition. The spirit and intent of all the statutes enacted to protect married women in their estates, and to give them *in that particular* the powers of *femes sole*, are limited in their construction to the exercise of that power. Though very full powers in that regard are conferred, as they should be, in order to their proper enjoyment ; yet all these statutes being *in pari materia*, are to be construed together as one in their letter, spirit and intent, precisely as if they were all contained in one act.

The statutes of 1848 and 1849, on their face and in their letter, recognize the disqualification of husbands and wives to contract with each other, in the right to take and receive estates from any person other than the husband. Why except him, but to prevent the construction that the common law was intended to be abrogated ? These statutes are the beginning, and they continue to be a part of a new system and policy, in relation to the separate estates of married women. What part of the common law then is abrogated, except that which the statutes express ? Has any jurist, has any lawyer supposed that a husband is not *now* bound to support, provide for and maintain his wife ? That from the obligations and duties which the marriage contract imposes, he has been discharged by these new statutes ? That his power to command and her duty to obey all reasonable commands has been severed and abrogated ? Do they confer upon her the option to say he shall not enjoy his marital rights and to select her own chosen substitute to exercise them ? Do they, in fact, amount to a practical divorce ? Better far for the permanence of the blessings of the marriage relation ; better far for the peace of society, the union and tranquillity of family relations that the divorce should be *total*, at the option of the parties, than that there should be a *partial* one created by an undefined *line* to be guessed at by loose interpretation, thus leav-

Perkins *v.* Perkins.

ing domestic bickerings to affect, if not overwhelm, the courts, and allowing the parties to a marriage contract to sue each other for every fireside controversy.

Did any one ever suppose that the possession of some separate estate by the wife released the husband in any degree from the common-law liability and duty to support and maintain his wife? If he refuses or neglects to furnish such support, may not the tradesman or mechanic sue the husband for necessaries furnished for her support? Would it be a good defence to an action for such legal liability for the husband to plead that the wife had a separate estate? Is the common law changed in this respect, because the husband abandons or lives separate from her? If the tradesman sues for necessaries furnished to the support of the wife, is the common law changed that requires him to prove that the husband has omitted to furnish them? Could the tradesman sue the wife upon such an account, because the husband refused to pay it? If the husband sues for such necessaries furnished, whom would he sue? What law has given him a better right than a stranger? Must he not sue the same person, sue himself and prove his own omission to furnish the necessaries? Why can he not do this? because of that legal unity which no statute has dissolved. If he may sue her for his services, as a legal right in a court of law, why may he not sue her for damages for withholding any marital right? Where then are the parties to stop? What a vast new field will thus be opened to litigation. Little did sober legislators conceive of the result of these new creations by construction, when they were engaged in making a *protective* statute to secure the estates of married women; barely to state these results and consequences is in effect to give reasonable and practical interpretation to the meaning and intent to the statutes in question.

But at common law, before the passage of these statutes, though husband and wife were held to be but one *person* in law, still that *person* was represented by the husband in all courts and places, except in equity, where the separate rights

of the wife could be sued for, defended and protected.   In all other respects her legal existence was suspended; she was not known.   The recent statutes made *in her behalf*, not his, have, to the extent expressed therein, enfranchised *her* as to those rights, and as to those only.   They have extended no powers, they have conferred no new rights upon the husband. If, when her separate estate is affected, she can sue and sue alone, by them she is allowed even to sue her husband if he interferes with it to her disadvantage.   They have not, certainly not in express terms, conferred the corresponding right on him to sue her.   They were passed *for her protection*, not his.   She has just such power as the statute expressly confers on her, no more.   Nor has he any more.   They have conferred none on him.   They have released nothing to him.   In *White* v. *Wager* (*supra*), DENIO, J., says, page 332, " It is quite apparent, from the provisions of (these) acts, that the design was not to confer any additional advantage upon married men, but it was intended solely for the benefit of the other party to the marriage relation."

The statute of 1862 (chap. 172, § 3) does, in fact, confer upon a married woman the power in general terms to sue and be sued in all matters having relation to her sole and separate property; and also to recover damages for injuries to her person (which damages before belonged to her husband).

This is a conference or rather a restoration of marital rights upon her, not on him; and if it includes the right to sue him for interference with her separate estate, it does not, in terms, confer on him any right to sue her.   But even as to her right to sue him, in an action at law, it has been adjudged to the contrary since the passage of that act in two General Term cases.   (*Gould* v. *Gould*, 29 How. Pr., 441 ; *Longendyke* v. *Longendyke*, 44 Barb., 366.)   These cases received much consideration by able and distinguished jurists, and we feel bound to follow their views.

The right to sue and be sued was a right that the *husband* always possessed before the statute, and independent of it. A statute conferring such a right on him would add nothing

to his power in this regard. But could he, therefore, though possessing such a right, sue his wife? Why not? He had before all the power at common law that she had conferred upon her by statute. Did any one ever suppose that under this power he could sue his wife in an action at law upon a contract made between them? Does the conferring by law an equal power upon the wife increase his powers? If the unity of the relation is so severed by this act that he can sue her for his labor, may she not sue him for hers? May she not sue him for the labor and care of nursing and taking care of his children? Nay, may she not sue him even for the labor of bearing them? To what do not these several rights to sue extend? Where is the jurist that dares to draw a line to say how much of the disability is removed and how much remains, or to declare that no line of limitation exists?

Until the highest court of review shall otherwise determine, I shall feel bound to hold that the unity of a person, created by the marriage contract between husband and wife, has been no further severed than the statutes, *in express terms* or *by necessary implication*, have effected that purpose; that the duty of the husband is now as ever to labor and provide support for his wife, and that it has not been changed by these statutes; that these statutes have not conferred the right upon husband and wife to make contracts between themselves to that end. But, on the contrary, the legislature in the last of these statutes (Laws of 1867, chap. 887) recognize the *unity* of the persons and relations of husband and wife, in expressly reserving and exempting them from communicating or disclosing, even as witnesses, any confidential communications made by one to the other during their marriage. The legislature, it is very clear, then, regarded the sacredness and unity of the relation not dissolved, but as existing to some extent. If we are right in this view, the justice erred in nonsuiting the plaintiff as demanded.

I am not unaware that there are various cases holding that married women having separate estates may employ their husbands as agents to assist in managing them. But this is

Perkins *v.* Perkins.

quite a different thing from the holding that the husband may bring an action against his wife at law for his services. This agency may be the best way in which he may labor to sup· port his wife, or aid in doing so. She ought not to be deprived of this aid in managing her estate. This power to make contracts existed at common law, but it was as agent, not as an independent and separate individual. The wife might be the agent of the husband,·and in that character *make contracts* which would bind him ; and such agency need not even be · express, but was implied from a variety of circumstances. This is in aid of the purposes and comfort of married and domestic life ; so, now, the husband may be the agent of the wife, in regard to her separate estate, and the term *contract* between them means just this—a contract of *agency.* So reading some of the *obiter* remarks found in the reports giving the word *contract*, as between husband and wife, this limited meaning, it is well enough ; beyond this, it is calculated to mislead.

Nor am I unaware of the *obiter* remark made in the case of *Fairbanks* v. *Mothersell*, reported in 60 Barb., 407, as follows : " I suppose as the law now is in regard to the separate property of married women, they may make special contracts with their husbands, and let jobs to them of particular work, such as building and the like, the same as though they were strangers." From what we see of this reported case this remark was not at all necessary to the decision. It was not a question between husband and wife, or whether one could enforce at law such a contract against the other. It was a mere question of agency, so far as we can judge. The wife in that case had given the husband the job of digging a cellar and laying the cellar wall upon her separate property, as distinguished from the other part of the building. She agreed to pay him $138 therefor, and did pay him, but could he have enforced the contract at law ? The husband employed the plaintiff to assist, the plaintiff supposing at the time that the husband was the owner. Afterward finding out to the contrary and that the benefit and advantage was to the wife

he sued the wife, treating the husband as her *agent*, and so the jury found the fact to be. This was right. The jury correctly found in the Justices' Court. The judgment was rightly affirmed on this ground in the County Court and by the Supreme Court. But I do not see how the question arises in this case that establishes the right of a husband to sue his wife at law. That question did not arise. The court does indeed remark, as I have said, *obiter*, that they suppose women may make contracts with their husbands. I concur in this if the appointment to an agency in such case can be called a special contract. I do not believe it is a legal binding contract existing between husband and wife. And as the point we have been considering was not in that case, it is, perhaps, a little unfortunate that the first marginal note of the reporter should be based upon an *obiter* remark. The case does not sustain this note. I should greatly hesitate to question the direct adjudication of that learned and able court, but they did not decide the question ; it was not there to be decided.

But if we were even to look at this case upon the merits, conceding the right of the husband to sue, the case is without merit. An implied contract could never exist at law between a husband and his wife, whom he was bound to support, for services done for her. The implication is the other way. The fact that they had previously lived separate, by turns, proves nothing but a condonation when they again came together. If an express contract was proved, according to the plaintiff's own testimony, it was not only to be for a year, but was conditioned that he should not drink whiskey. I think his own testimony showed that there was no performance on his part, but on the contrary he proved a breach, and he should have been nonsuited. But I do not put much stress upon this review on the merits.

Since preparing the foregoing opinion two cases have appeared reported in 4 Lansing's Reports, viz.: *Adams* v. *Curtis*, 164, and *Minier* v. *Minier*, 421, which are supposed to be in conflict with the views above expressed. They are not so in the material point. In *Adams* v. *Curtis* the case

was correctly decided upon what appeared in it. That was
an action by a wife against a copartnership, of which her hus-
band was a member. The husband did not appear in the
case, and his copartner did not appear for him. It does not
appear what were the pleadings nor what the issue tried. It
only appears that the testimony showed that the plaintiff was
the wife of the copartner Adams, and that she performed the
work for the firm for which the action was brought. She was
beaten in the Justice's Court. She appealed, and the County
Court reversed the judgment; for what reason does not appear
In the Supreme Court the judgment of the County Court was
affirmed, and the law was there discussed as to the right of a
wife to sue her husband. The leading opinion, by MILLER,
J., merely holds that such a contract could be made, and if
made, could be maintained under the statute of 1862, at law.
One member of the court, HOGEBOOM, J., puts his assent to
the decision on the ground that the husband not having
appeared in the case nor any one for him, there was no one
to object to his being sued or to a judgment against him, and
that even if he could not be sued, his copartner Curtis was
bound at all events, and he could seek contribution over from
the husband. On either of these propositions the case is not
in conflict with the views we have expressed above, that the
statutes were passed *to enfranchise married women, and to
protect their property, and not to protect or extend rights to
their husbands.*

The case of *Minier* v. *Minier* (*supra*) is to the same effect,
that a married woman may maintain an action against her
husband to recover moneys intrusted to him by the wife, or
for lands which had been purchased with such moneys and
title taken in his name. Such has always been the law of
equity, and the modern statutes have but extended it to
actions at law. The only criticism to which this last cited
case is subject is the *obiter* remark of the learned judge, that
the act of 1862 " warrants the bringing of a suit both by a
wife against her husband *and by a husband against his wife.*"
This last branch of the sentence was not a question before

the court, and I cannot give it my assent. It is in conflict with direct holdings in previous cases in the higher court, to wit, in *White* v. *Wager* (25 N. Y., 328) and in *Hunt* v. *Johnson* 45 id., 27). In this last case the court drew the distinction between an instrument made by a wife to her husband and one from a husband to the wife, even at common law. Referring to another case Hunt, J., says: "*That* case differs from the present action; *that* was a conveyance by wife to the husband; this was by the husband to the wife. They do not necessarily stand upon the same basis in equity. *It is the duty of the husband to provide an assured and comfortable support for the wife during her life and after his death. No duty rests upon the wife to provide for the husband.* The custom of the country and the laws of the land look upon her as the party to be aided and sustained by the toil and wealth of the husband. An application of the husband's property for her comfort is eminently equitable, and has been favored by the courts from their earliest existence. No judge has yet announced that this equity or this favor is to be extended to gifts from the wife to the husband. There is, in the nature of things, a broad and palpable distinction against an equitable claim in the husband's favor."

Interpreting these statutes (including that of 1862) to be *in pari materia*, as if all were contained in one act, beginning with those of 1848 and 1849, entitled "for the more effectual protection of the property of married women; taking the common law as it has ever been declared; abrogating none of the common law by forced construction, not expressed by a statute; and giving due force to the maxim *expressio unius est exclusio alterius*," husbands are excluded from their provisions. The statutes of the State of Pennsylvania (Laws of session.1848, p. 536, &c.), which are almost identical with our own, have been so construed in their highest courts. In the case of *Diver* v. *Diver*, reported in 56 Penn., 109, Strong, J. (now of the United States Supreme Court), said: "The design of this statute (1848) was single. *It was* not to destroy the oneness of husband and wife, but to protect the

Perkins *v.* Perkins.

wife's property. To effectuate this object *she* is enabled to own and use and enjoy her property by removing it from under the dominion of her husband. It is to be as her separate property is enjoyed; as property settled to her separate use. *The act no more destroys her union with her husband* than does a settlement for her separate use. It is a remedial statute, and we must construe it so as to suppress the mischief against which it was aimed, *but not as altering the common law any further than is necessary to remove the mischief.*

There is, then, no doubt as to what the common law was and is. It is equally as clear that there is no *expression* of an intent in this statute to destroy the unity or oneness of husband and wife, except as to her, in the single particular of her control of her separate estate. There is no question that statutes are to be interpreted as not changing the common law, unless it is so expressed in terms or by necessary implication. There is nothing in the act of 1862 or in its title that intimates an intent to add new rights or remedies in favor of a husband. Looking, then, at the common law as still being in force, except as expressly changed by these statutes, let us see what are the expressions in the act of 1862, from which it is attempted to *imply* a power of destruction of the unity of the parties, husband and wife, further than is expressed. Section 7. " She may sue and be sued *in all matters having relation to her sole and separate property.*" But by whom may she be sued? By herself? Of course, not. By him who is in oneness or unity with her. Can he, the one-half of this united one, sue the other half, by virtue of this statute? He certainly could not sue by the common law. What language, then, is found in this statute that authorizes *him* to sue *her?* It is a universal canon of construction of statutes, that unless the provisions of a new statute are so repugnant to the common law that both cannot exist together, the common law is not abrogated, but remains in all its force. (Dwarris, Am. ed., 185, and notes.) This is the law of interpretation. True, the language of the statute of 1862, that

she may sue and be sued, is broad enough, in general terms, to include all parties that are several and equal, and under no disability; but it does not include persons that are under disability. The husband is, under the common-law disability, unable to sue his wife.

This statute is not broad enough, and does not divorce him from that disability, whatever it may do for her. It is not broad enough to absolve *him* from the liability, as well as the duty, to labor for the support and maintenance of the wife. Far less does it authorize him to sue her for his support. Though in its language it does in one particular, and, in that only, enfranchise her, and confer rights on married women for a particular purpose, there is not an expression in it that confers new powers upon him. The marriage contract, with its liabilities, cannot be so severed by legislative or judicial construction in favor of a husband. He cannot be so released from a binding civil contract. Besides, such a contract is clearly against public policy. If, indeed, the statute contained an express provision to that effect, it would, I think, be void on the ground of its being retrospective in its operation upon marriages solemnized before its passage.

I have been the more inclined to meet and resist the construction claimed by the plaintiff thus earnestly at this time, because I have seen the disposition manifested in several *dicta*, which are already found in the reports, tending in that direction.

I regard such a construction as in effect judicial legislation, though in none of the cases has the question been necessary to a direct adjudication. It is entering into a new and unexplored region for judicial action. Its explorations are without compass or chart to direct its forward course or its retreat. The way will be found dark and full of stumbling blocks, and with no experienced guide. Until the legislature shall open the way or light up the path, I am not disposed to enter.

I think, upon the main question I have discussed above,

that the judgment of the County Court and that of the justice should be reversed, with costs.

BALCOM, J., concurred.

MILLER, P. J., concurred in the result for the reasons stated in the following opinion:

MILLER, P. J.   I cannot agree with the opinion of Justice POTTER in this case, that a married woman cannot be sued by her husband upon a contract made with him, and I think that such a construction of the provisions of the married woman's act would be in conflict with the adjudications of the Supreme Court, and especially with the decisions of the General Term of this department.   The remarks of JOHNSON, J., in *Fairbanks* v. *Mothersell* (60 Barb., 406), which are quoted in the opinion of the learned judge in the case at bar, are entitled to great weight, even if they may be regarded as *obiter*.

The claim in the case referred to was for work done for the benefit of the married woman's estate, while the defence was that the husband had the contract and the work was done upon his employment of the plaintiff on his own account, and not for the defendant.

The court recognized the right of the wife to contract with the husband, but *held* that, as no part of the work was done on the husband's job, the case stood simply upon the employment of the plaintiff by the husband to work for his wife upon her separate property, without any express agreement whether he should be paid by the husband or the wife, and the defendant knowing the work he was doing, the law would imply a promise on her part to pay for the services, if it was in fact his work.   I am not prepared to say that the remarks made are not applicable to the case presented.

In *Adams* v. *Curtis* (4 Lansing, 164) it was held that a married woman may maintain an action to recover for her labor or services under a contract made with her husband therefor, without showing that she carried on business on her own account, beyond that out of which the claim in suit arose. If she can maintain such an action, of course she could be

sued for the same reason and under the provisions of the same law. It is there said: " The effect and intent of the act is to remove all the liabilities of coverture, so as to enable her to sue and to be sued, as to all contracts, in all respects as though she was in fact unmarried." The case of *Longendyke* v. *Longendyke* (44 Barb., 346) is commented upon, and it is said that the reasons assigned for holding that the wife could not sue the husband in an action for an assault and battery had no application.

In *Minier* v. *Minier* (4 Lansing, 421) it was held that a married woman may maintain an action against her husband to recover possession of her real estate, from which she is excluded by him. PARKER, J., says: " The terms and spirit of the statutes by which married women are invested with the same rights, in respect to their sole and separate property, as though they were sole, should be carried out by such construction as would allow the wife the same remedies against her husband as, in like cases, would be appropriate against other persons."

The effect of these decisions is to place the husband and wife in the same position toward each other as strangers, so far as their contracts are concerned, and such appears to have been the intent and spirit of the act.

True, it is an innovation upon old established customs, and many ideas which had become firmly fixed by a series of legal adjudications. But the true spirit of the act appears to have been to sweep away the rules governing the relations between husband and wife, as they formerly existed, and to establish new and different ones.

If we follow these decisions I am at a loss to see how we can hold that a contract between the husband and wife cannot be enforced in an action at law.

But while the law, as I understand it, upholds such actions, agreements between husband and wife should be carefully considered and be subject to the most rigid scrutiny. Before the husband should be allowed to recover for his services upon a contract with the wife, the proof should be clear strong

Perkins *v.* Perkins.

and conclusive. The nature of the marital relation which obligates the husband to support the wife, or at least to render all the services in his power to that purpose, should induce great caution in allowing a recovery for services when engaged in the mere performance of this duty. Certainly so, where the case tends to show that the wife supported the husband instead of the husband supporting the wife.

According to the testimony of the husband on the trial there was no express contract, no promise to pay the husband for his services. The defendant was in possession of the hotel at the time and was to give up everything to plaintiff's charge, and he was to be the landlord. They were to keep the hotel together for a year, and if they could not make it go, were to sell out. The plaintiff told defendant what work he must do, but there were no explicit terms agreed upon which made a contract of the defendant to pay for services rendered, any more than a contract of the plaintiff to pay defendant for her services. It was only a mutual arrangement between a husband and wife, who had been separated from each other, to make an attempt to live together once more, and nothing beyond this. No contract can be implied from the facts presented, and certainly should not, as between husband and wife, under the circumstances existing.

The court were, therefore, wrong in refusing the motion for a nonsuit, and for this error the judgment should have been reversed by the County Court. As the County Court failed to do this there was error; and its judgment, with that of the justice, must be reversed with costs.

Judgment reversed.